THE BOARD OF EDUCATION OF THE CITY OF TOPEKA V. R. B. WELCH.

1. BOARD OF EDUCATION — *Purpose of Corporate Functions.* The corporate functions of the board of education of a city of the first class are granted to assist in carrying out the general common-school system adopted by the state.

2. ———— *Discretionary Powers.* The boards of education of cities of the first class are vested with large discretion in all matters pertaining to the management of the schools under their control. What rules and regulations may best promote the interest of the schools, and what branches shall be taught, other than those expressly prescribed by the statute for all school districts, are matters left to the determination of the directors of the boards; but they should always keep in view the highest good of the schools. With the discretionary powers of such officers, the courts will not interfere, unless there has been such an abuse of their discretion as works palpable injustice or injury.

3. Schools—*Various Grades.* The boards of education of cities of the first class have the power to establish and maintain various grades or departments in city public schools, including a high-school grade, or department.

4. High School—*Issuing Bonds.* Under chapter 196, Laws of 1891, upon proper proceedings being had therefor, and after a vote of a majority of the qualified electors of the city in favor of such a proposition, a board of education may issue bonds in accordance with the provisions of such chapter to purchase a site and erect a high-school building.

5. Election—*Mayor and Council to Canvass Votes.* As the territory controlled by the board of education of the city of Topeka for school purposes embraces the same territory as the corporation of the city of Topeka, the mayor and council of the city, under the ordinances of the city providing for canvassing the returns of all special and general elections held within the city, have power to meet and canvass the returns of a special election held under the provisions of chapter 196, Laws of 1891, to issue bonds to purchase a school site or build a school building within the city.

6. Canvassing Board—*Its Duties.* A canvassing board cannot relieve itself of its duty by refusing to canvass the returns of an election properly presented to it; and if such a board adjourns without canvassing the returns before it and declaring the result thereof, its duty is to reassemble as soon as possible and make a correct canvass of all the returns. (*Lewis v. Comm'rs of Marshall Co.*, 16 Kas. 102; *Rosenthal v. State Board of Canvassers*, 50 id. 129; *In re Gunn, Petitioner*, 50 id. 155.)

*Original Proceeding in Mandamus.*

Action brought in this court for a peremptory writ of *mandamus* to compel the defendant, as president of the board of education of the city of Topeka, to sign $85,000 of 4-per-

cent. 20-year bonds about to be issued. They have been sold to the commissioners of the state school fund, on condition that the commissioners shall be satisfied of their legality. The election authorizing these bonds was held on March 7, 1893, under chapter 196 of the Laws of 1891. On March 22, 1893, an application to enjoin the issuance of these bonds was made to the district court of Shawnee county. The application was heard by the district court on March 29, 1893, and by consent of all parties the hearing was made a final trial of the action. Upon the trial, the injunction was refused. The trial court (HAZEN, J.) handed down the following opinion:

"This action is brought on behalf of the state of Kansas, on the relation of the attorney general, against the board of education of the city of Topeka, to enjoin the issuing of $85,000 worth of bonds, which bonds, it is alleged, are to be issued for the purpose of buying a high-school site and erecting a high-school building. It is claimed on behalf of the plaintiff that the board of education has no power to erect a building thereon. It is claimed on behalf of the board of education that it has such power; that it has complied with the law, and that it should now be permitted to go on and issue these bonds. It is contended on behalf of the plaintiff, that the matter of submitting this proposition amounted to a constructive fraud in this: That when the proposition was submitted to the voters as to whether or not they would vote for or against the bonds, certain sites were designated upon the ticket, and the price of each indicated, and that it was the understanding that the board should purchase the site receiving the greatest number of votes, and at the price indicated; that is, it would purchase the site receiving the largest number of votes at the price indicated on the ticket. It is claimed that that amounted to a constructive fraud; not actual fraud, but that the effect of it was not to allow a fair and impartial expression of the voters upon the proposition. The case of *Lewis v. Comm'rs of Bourbon Co.*, 12 Kas. 186, is cited to sustain that position. In that case, there were railroad bonds to be issued to two railroads to be voted for, and the proposition was so framed that the voter could not vote for one railroad proposition without voting for both, and the supreme court held in that case that that was not permitting a free

and fair expression of the people upon the proposition submitted. But that is not this case. Here the main question was the issuance of the bonds. They were voting for or against the bonds, and the remainder of the ticket was simply taking an expression of the voters as to which one of the sites, in their opinion, was the proper one for the board to purchase. Now, it seems to me that this was a proper matter to be submitted to the people. The voters had a right, or ought to have a right, as far as they can, to say where the school shall be located — in what part of the city. It is claimed that this induced persons to come out and work for the bonds, and possibly brought out a larger vote than otherwise would have been brought out. I think that is true. But the expression of the voter at the time he cast his vote was his expression either for or against the bonds. There is nothing to show in this case that the voter was influenced in any way by the fact that certain sites were selected, and would be built upon if the bonds carried. The court is of the opinion that that position is not well taken.

"Again, it is claimed that the election law under which this election was held is imperfect, in this: That there is no provision for canvassing the vote and declaring the result. This is substantially true; but the courts will be slow to interfere with the will of the people, where it is shown that there was a fair election, and that the only question is the question of canvassing the vote and declaring the result. There is no claim that there was any fraud on account of the manner in which the vote was canvassed. There is no claim but that there was a true and correct canvass of the vote, as in fact taken on the day of the election. This being true, the court is of the opinion that it should not interfere where there has been a fair expression of the people upon the proposition. When the polls close at night, the proposition is either won or lost, and the only thing that remains to be done is to declare the result; and, if that result is declared, and correctly, too, it makes but little difference as to the manner of arriving at the result, if a fair canvass of the vote is had. In this case, the council canvassed the vote. But it is claimed that they should have canvassed the vote at the first meeting after the election. There was a meeting of the council, but at the first meeting there was not a quorum present, and they adjourned *sine die*. It is claimed that after that they could not canvass the vote; and, while nothing had been said on the discussion of this

question, yet a good deal had been said one way and another in reference to the Rosenthal case (50 Kas. 129), decided by our supreme court, applying to this case upon this proposition; but there is this distinction between that case and this: There, the canvassing board had met, and, after performing its whole duty, had adjourned; here, the canvassing board had met, but for want of a quorum had adjourned. Now, it is a settled proposition, that if it is the duty of a body of men to canvass the vote, and they meet and adjourn without doing that which they are required to do by law, the court will by *mandamus* compel them to meet and act. The court will not control their action, but will compel them to act. In this case no action had been taken, and if the city council had refused to canvass the votes, and adjourned without canvassing them, upon proper showing, the court would by *mandamus* compel them to meet and canvass the vote, without attempting to control the result. If the courts could do this, then the council could certainly come together after that, and canvass the vote; because that which they could be compelled to do by *mandamus* they could voluntarily do. The court is of opinion that that position is not well taken.

"We come next to the real question in this case, and that is, whether any power exists in the board of education to maintain a high school. Our constitution is not like any other constitution that the court or the attorneys on either side in this case have been able to find. It provides for a uniform system of common schools and other schools of a higher grade. It is contended on behalf of the plaintiff in this case that the title of the act authorizing the issuing of these bonds is, 'An act pertaining to common schools,' and that the school building the board of education proposes to build in this case is a high school, and that there is a distinction between a common school and a high school, and that the title of an act applying 'to common schools' has no application to high schools, and therefore, the board has no authority to act in the premises. It is contended on behalf of the board of education that the building of this school is simply a part of the general system of common schools. While the expression 'high school' is used, where the building is separate from the other buildings, and different branches are taught, yet it is claimed that it is a part of the general system of common schools. The question is not an easy one. It is a question that might be decided either way, and good reasons given for the decision. But the serious

question is, where shall the courts draw the line between 'common schools' and 'high schools' and say this branch belongs to the common, and this to the high school? We all know as a matter of experience that all of the different branches now taught in the common schools were not taught years ago. We know that algebra was a thing unknown in the common school when most of us went to school; that physiology, bookkeeping, physical geography, music, and quite a number of other branches that could be named, were never taught in our school days in the common schools. Yet, they are now the most ordinary branches, taught in almost all of the common schools, and recognized by the public as a proper and legitimate exercise of the control of the board of education and district boards. As we advance, our school systems advance; and what is taught now possibly in a few years will not be taught in our common schools, and other branches will take their places. And the question arises, does it lie in the power of the courts to say where the dividing line shall be between the common school and the higher branches?

"According to the evidence in this case, the board of education of the city of Topeka has divided the schools of this city into 12 branches or years. These different branches are taught in different school buildings; some in one, some in another. In the same school building, in different rooms, different branches are taught; and when they have reached the eighth grade, then they go into what is denominated the 'high school,' and are there taught the four grades covering that department. Does it lie within the power of the courts to say that the dividing line between the common and high school is between the eighth and ninth grades, and say up to this grade is 'common,' beyond this is 'high'? If the court has the power to do this, then why cannot the court divide it between the seventh and eighth grades, or at any other grade, and say that these are the grades that can be taught in the common schools, and beyond this the board cannot go? This decision is not confined alone to the proposition of building a high school here in the city of Topeka, but it goes far beyond that. It reaches the question whether the board of education has the power to maintain a high school in the city of Topeka; because, if it has no power to erect this building, if it has no power to purchase this site, then every act the board of education does in the way of levying a tax for the purpose of maintaining this school, including hiring teachers,

buying furniture, etc., is illegal. When we stop the board of education in the building of this building or the purchasing of this site, it is not the end of this controversy. We must go beyond that, and not only decide that the board of education cannot purchase this site and build this building, but the effect of the decision would be to destroy the high school of the city of Topeka; and if that is the law, it destroys the high schools in every other city of the first class in the state of Kansas.

"But it is said that the constitutional provision in reference to schools has been construed in *Koester v. Comm'rs of Atchison Co.*, 44 Kas. 141, and that the decision there is against the issue of these bonds. The question in the Koester case, it is true, appears as though the supreme court intended to draw a line between the high school and the common school. But this court would prefer to leave it to the supreme court to say where that line shall be drawn. In that case, there was really but one question. The question was as to the building of a county high school, and it was attempted to be enjoined. The supreme court held that the injunction must be denied, because the constitution authorized the building of high schools. Of course that was true, and that is all there is in that case, except a remark dropped by STRANG, C., deciding the case. That was the decision in that case, and whatever the commissioner said outside of the point in issue is not binding, only so far as it may be instructive.

"From an examination of our statute, it is plain to be seen that, since 1868, our legislature has provided for high schools. Under this same kind of a title, our legislature has provided for graded schools in districts and in union districts. Under this same kind of a title, it has provided for these graded schools teaching advanced branches, and this has all been done under the title of an act no broader than the act in question here. In 1867, it authorized the teaching of German in our common schools, under certain circumstances; and, so far as I have been able to determine, there is no limitation placed upon the board of education or school-district board in reference to what branches shall be taught in the common school. Certain branches must be taught, but there is no limitation upon the branches that may be taught. All of these acts provide that certain branches must be taught, and then such others as may be provided by the board of education. Can the courts say that, because of the fact that the

board of education has seen fit to have Latin, French or any other of the advanced branches taught in our schools, these are not common-school branches? Is this a matter under the control of the courts, when the legislature has given exclusive power to the board of education? But it is said that our legislature has recognized the fact that the constitution provides for two different branches of schools, because it has provided by a special act for high schools. That is true, and it is hard to reconcile that with our general legislation. But that proposition is met on the other side by the proposition, running through our legislation from 1868, that under a title the same as this title, it has been continually providing for high schools and graded schools of that character; and this meets the argument on the other side. In 1876, the legislature revised the entire school laws and reënacted them, and among that revision we find these same provisions running through the statute of 1876, giving the boards of education power to maintain high schools; giving the boards in the different districts power to unite and establish graded schools; and giving two or more districts power to unite and establish graded schools — all under the title of an act no broader than this. Yet, if we are to follow the contention of the plaintiff in this case, these acts are all illegal, because they contend that this power does not exist under an act the title of which provides for the regulation and maintenance of common schools. If this be true, then all these acts must be held illegal, because they are attempting to authorize the maintaining of graded and high schools under an act the title of which applies to common schools. A decision of this kind would not only prevent the maintenance of high schools, but it would prevent the maintenance of graded schools of every kind and character in the state of Kansas. The general understanding of the people is, that graded and high schools can be maintained under the title of an act applying to common schools, and this understanding has been acquiesced in for a sufficient length of time in this state to show that the people generally have not construed the constitution as contended for by the plaintiff in this case, but, on the contrary, have given it the other construction. To now hold as contended for by the plaintiff, would be to give a construction to the constitution different from what it has been receiving by the people generally; and, while the general understanding may not be of much weight, yet it is of some value."

No proceedings in error have yet been filed in this court to review or reverse the order and judgment of the district court of Shawnee county.

*Henry Keeler,* and *J. G. Wood,* for plaintiff:

The first and chief objection to the exercise of the power to issue the bonds in question is that chapter 196 of the Laws of 1891 does not by its terms include a site and a building for a high school; and that if by its terms it does include them it is to that extent unconstitutional. The constitutional provisions relied on to sustain this objection are § 2 of article 6 and § 16 of article 2 of the constitution of Kansas. The point of this objection is a claim that the branches of learning taught and intended to be taught in the Topeka high school are higher than those which can be properly or legally taught in the common schools. In answer to this objection, we claim that the phrases "school site" and "school building" in said chapter 196 as necessarily include a site or a building for a high school as a school for any other grade. There is nothing in the act that indicates an intent on the part of the legislature to exclude from its provisions any department or grade of the city schools, but on the contrary all of the language is broad enough to plainly include all the schools of the city.

We further claim, that the Topeka high school is a part of the common-school system of the city, and that what are usually denominated the higher branches of learning may properly and legally be taught in any of the common schools of Kansas. The teaching of foreign languages in the common schools, using the English language as the vehicle of instruction, is not a violation of the proviso of § 73 of the general school law of the state. *Powell v. Board of Education,* 97 Ill. 375.

The term "common school" is defined by Webster's Dictionary as follows: "A school maintained at the public expense and open to all." The legislature of the state of Kansas has construed the term "common school" to include

not only the ordinary country district school, but also the city graded school and the city high school. The legislature of the state of Ohio has also given its construction of the term in question, and has recognized the high school as a part of the common-school system.

We have not found a statute in any state which prohibits the teaching of the higher branches in the common schools. The courts do not interfere with the discretion of school boards in this respect, except to prevent the public schools from being used in the interest of a church or a religious belief or a system of theology. The case of *Board of Education v. Minor*, 23 Ohio St. 211, is a leading case on this subject, in which it was held that the board of education very properly excluded religious instruction from the public schools of the city. It goes without saying that the state will not allow the teaching in the public schools of that which is contrary to good morals. With these limitations as to religion and morality, boards of education may extend the curriculum in common schools as high as their judgment dictates and the means in their control allow. See *McCormick v. Burt*, 95 Ill. 263; *Powell v. Board of Education*, 97 id. 375; *Stuart v. School District*, 30 Mich. 69; *High School v. County of Clayton*, 9 Iowa, 177.

It seems to us that a due consideration of the language used, and the purpose for which it was used, makes it absolutely certain that the framers of the constitution intended to provide and did provide: *First*. For a system of "common schools," commencing at the rudiments of a school education. *Second*. For a system of "schools of a higher grade," which system does not commence at the rudiments but commences with branches that require some prior educational advancement. The radical and in fact the only legal and essential difference in the extent of instruction in these systems is in the boundary where the instruction commences. There is no legal limit as to the point where it shall end. The extent to which either system may go upward is limited only by the means within the control of the respective school boards or school officers.

In each and all of the school districts of the state of Kansas the schools are divided into grades wherever the density of population and the financial means in the control of the school board will warrant it. In several of the most considerable cities they approach or reach 12 grades, which is the number in Topeka. In these larger cities it is usual to group some number of the highest grades together and dignify them by the name of "high school;" but this grouping and this dignifying in no way separates these grades from the common-school system of the city. The teachers are hired and controlled by the same board, and are paid out of the same funds as the teachers of the lower grades. This grouping of these highest grades under the title "high school" is not done pursuant to the direction of any statute. It is done entirely at the discretion of the board of education, for the convenience and effectiveness of the school officers and teachers, and as an incentive to higher effort on the part of pupils. There is no legal or fixed rule as to what grades should be so grouped. The board of education is at liberty to include any number of grades at its discretion.

All the public schools of the city belong to one system, and under the law are classified, located and managed by the board of education in the exercise of its best judgment and discretion. In order that it shall be the common-school system required by the constitution, it must afford instruction in the rudiments of learning; but having done this, the board has full authority to include other branches and to transfer pupils from school to school, from the lowest grade in the primary department to the highest grade in the high-school department. There the power of the board of education of the city of Topeka ends. The city has a single complete system of schools, commencing at the rudiments taught in the primary department and extending to the highest branch taught in the high-school department. All are supported out of a common fund. All are governed by the same board, and by uniform rules as to promotion, discipline, and instruction.

All are equally open to all children residing in the city, according to their stage of advancement in learning.

In *Koester v. Comm'rs of Atchison Co.*, 44 Kas. 141, this court held that a statute providing for a county high school was not in conflict with § 2 of article 5 of the constitution. If city high schools are not a part of the common schools, there is no constitutional statute authorizing their support or even their existence. All authority for the creation, maintenance and support of city high schools is derived from "An act for the regulation and support of common schools," (ch. 122, Laws of 1876,) and acts amendatory thereof. None of the amendatory acts have titles which make them applicable to other than common schools.

The opinion of the court was delivered by

HORTON, C. J.: The application to prohibit the issuance of $85,000 of 4-per-cent. 20-year bonds by the board of education of the city of Topeka, recently made to the district court of Shawnee county, after a full hearing, was denied. That judgment, until reversed, modified, or suspended, is conclusive; but it appears that the bonds about to be issued have been sold to the commissioners of the state school fund, and it is important that their legality be settled by this court. In view of the lengthy opinion handed down by the learned trial judge in the case disposed of in the district court of Shawnee county, it is unnecessary to refer to all of the objections presented against the issuance of the bonds. An election was held in the city of Topeka on March 7, 1893, for the purpose of voting on a proposition to purchase a site and erect a high-school building, not to exceed $85,000. On March 10, 1893, at 8 o'clock P. M., the city council met for the purpose of canvassing the returns of the election, but no quorum being present, the council adjourned without day. On March 15, 1893, in accordance with a call of the mayor of the city of Topeka, at the request of the board of education of the city, the city council again convened, at 7:30

o'clock P. M., for the purpose of canvassing the returns of the special election and declaring the result thereof. After the canvass, it was declared that 2,549 votes were cast in the city for the issuance of the school bonds, and 1,560 against the bonds, and that the proposition for the issuance of the bonds received a majority of 989 votes. On the 17th day of March, 1893, the board of education of the city of Topeka convened, and, having received from the city clerk duplicate returns of the election, proceeded to canvass and declare the result. Its canvass was the same as previously declared by the mayor and city council. The election was held and the bonds voted under chapter 196, Laws of 1891, the title of which reads: "An act for the regulation, support and maintenance of the common schools in cities of the first class, and repealing certain other acts." The principal contention is, that under the provisions of chapter 196, cities of the first class have no authority to purchase a school site or build a school building for a high school; that such a school is not connected with or a part of "a uniform system of common schools" provided for by § 2, article 6, of the state constitution. That section is as follows:

"The legislature shall encourage the promotion of intellectual, moral, scientific and agricultural improvement, by establishing a uniform system of common schools, and schools of a higher grade, embracing normal, preparatory, collegiate, and university departments."

The board of education of the city of Topeka has established a course of instruction in the common or public schools of the city, subdivided into 12 years or grades. The first four years or grades in the course of instruction are kept and maintained in 21 buildings, and are known as the "primary department;" the fifth and sixth years or grades are taught in 16 buildings, and are known as the "intermediate department;" the seventh and eighth years or grades are in six buildings, known as the "grammar-school department." The scholars in the ninth, tenth, eleventh and twelfth years or grades assemble in a building known as the "high school,"

presided over by a principal selected by the board of education. At present, the board of education does not own sufficient buildings to accommodate all the school children, and, since 1887, has been compelled to rent a building for the exclusive use of the grades generally known as the "high school." Paragraph 5634 of the general school law provides:

"That in each and every school district shall be taught. orthography, reading, writing, English grammar, geography, and arithmetic, and such other branches as may be determined by the district board: *Provided,* That the instructions given in the several branches taught shall be in the English language."

The corporate functions of the board of education of a city of the first class are granted by the state to assist in carrying out the general common-school system adopted by the state. (Laws of 1876, ch. 122, art. 10; Laws of 1881, ch. 149, §§ 1, 2; Laws of 1885, ch. 100, § 1; Laws of 1891, ch. 196; *Knowles v. Board of Education,* 33 Kas. 700.)

1. Board of education—purpose of corporate functions.

In the last case it was remarked that

"The board of education of the city of Topeka has power to select its own officers, to make its rules and regulations, to establish a high school whenever in its opinion the educational interests of the city demand the same, and to exercise sole control over the public schools and school property of the city."

(See *Board of Education of Cincinnati v. Minor,* 23 Ohio St. 211; *McCormick v. Burt,* 95 Ill. 263; *Stuart v. School District,* 30 Mich. 69; *High School v. County of Clayton,* 9 Iowa, 177.)

In the statute of 1876, entitled "An act for the regulation and support of common schools," it is expressly provided "that the board of education shall have power to establish a high school whenever in their opinion the educational interests of the city demand the same." (Laws of 1876, ch. 122, art. 10, § 4.) In that act, although the title refers to "common schools," the legislature includes "high schools" as a part of the "uniform system of common schools."

In the statute of 1879, concerning boards of education of cities of the first class, it is provided that such boards may "organize and maintain separate schools for the education of white and colored children, except in the high school, where no discrimination shall be made on account of color." (Laws of 1879, ch. 81, § 1; Gen. Stat. of 1889, ¶ 5715.) High schools are treated in that statute as under the control of the boards of education. In the high school of the city of Topeka, there are taught, among other branches, mathematics, physics, history, English classics, rhetorical exercises, vocal training, physical culture, Latin, and German. An education acquired through the medium of the English language is an English education. If the same branches were taught in the Latin or the German language, it would not be an English education; but the mere fact that the Latin and German languages are taught does not change the character of the school from an English one. The common-school medium of instruction is the English language, in accordance with the provisions of the statute. (*Powell v. Board of Education*, 97 Ill. 375.)

While the school law prescribes that certain branches shall be taught in the common schools of the state, it permits "other branches" to be taught, as may be determined by the the district boards. Boards of education of cities of the first class have the power to make rules and regulations concerning the public schools in the cities, subject to the provisions of the laws of the state. The statute is permissive authority for the various boards of education of the state to teach in the common schools the higher branches, including Latin and the modern languages. The boards should exercise their best judgment, keeping always in view the highest good of the public schools. Under our liberal and beneficent system of common schools, we perceive no good reason why the higher branches prescribed by the board of education of the city of Topeka may not in its discretion be taught in the public schools, and no

2. Discretionary powers.

good reason why scholars desiring to be instructed
3. Schools—vari-    in such branches may not be provided with a sep-
   ous grades.
arate school building, properly furnished, whether
it be called a public school, a graded school, or a high school.

The legislature, within the terms of the constitution, has
established a system of common schools. High schools are
referred to as a part of the system. Under the provisions of
chapter 196, Laws of 1891, if certain preliminary proceed-
ings are taken by boards of education, the quali-
4. High school—    fied electors may vote bonds for the purchase of
   issuing bonds.
school sites and the construction of school build-
ings. Whether the school buildings proposed to be con-
structed and voted for shall be called a graded school or a
high school is immaterial, if, under the control of the board
of education, it is carried on in accordance with the statute
concerning common schools. Of course, the legislature, under
the constitution, has full authority to provide for the estab-
lishment of schools of the highest grade, such as embrace
normal, preparatory, collegiate and university departments;
but this does not forbid the legislature from establishing
common schools having graded, or high-school departments.

It was remarked in the opinion in *Koester v. Comm'rs of
Atchison Co.*, 44 Kas. 141, by STRANG, C., that the high
schools authorized by chapter 147, Laws of 1886, "are schools
of a higher grade than district or common schools," and it is
insisted that that decision is conclusive against the power of a
board of education of a city of the first class from organizing
a high-school department as a part of the common or public
schools of a city. The county high school, permitted to be
established under that statute by every county having a pop-
ulation of over 6,000 inhabitants, may be considered "schools
of a higher grade than district or common schools." But the
decision in that case was not rendered solely upon the ground
that such a school is of a higher grade. It was determined
in the case that, if it were a school of a higher grade, it was
especially authorized by the constitution of the state; but if it
were not so, then that the constitution did not forbid the es-

tablishment of such a school by the legislature.    County high schools, provided for in that statute, are expressly established for the purpose "of affording better educational facilities for pupils more advanced than those attending district schools, and for persons who desire to fit themselves for the vocation of teaching."    The board of education of cities of the first class are compelled to prescribe as studies in the common schools reading, writing, arithmetic, geography, etc., but may also in their discretion prescribe "other branches" to be taught.    The other branches, as we have stated, may include the "higher branches," but not necessarily so.    In the county high schools for "better educational facilities than the district schools," the higher branches must necessarily be required in order to carry out the purpose of the legislature.    There is nothing whatever in that decision preventing the board of education of a city from providing for the teaching of the higher branches in the common or public schools under their control, or from classifying the school children or scholars into various departments and permitting such departments to be taught in separate rooms or buildings, whether they be known as the primary, the intermediate, the grammar or the high-school department.    If all such grades or departments are maintained and regulated in accordance with the provisions of the statute as common or public schools, they are necessarily a part of the common-school system of the state.

Another objection to the exercise of the power to issue the bonds is, that chapter 196 of the Laws of 1891 is so vague and incomplete as to be inoperative, because it does not provide for any canvass of the returns of the election.    The returns were canvassed in accordance with the laws of the state and the ordinances of the city, except that, there being no quorum of the city council present on the Friday succeeding the election, the council was, on the call of the mayor for that purpose, convened a few days later, and then canvassed the returns.    The territory controlled by the board of education of the city of Topeka for school purposes embraces the

5. Election—
mayor and
council to can-
vass votes.

same territory as the corporation of the city of Topeka, and we are inclined to the opinion that the mayor and council of the city, under the ordinances of the city providing for canvassing the returns of all special or general elections held within the city, had ample authority to meet and canvass the returns of the election held upon the proposition to issue the bonds for the high school. This, however, was supplemented by the canvass of the board of education.

There is nothing whatever in the objection that, as no quorum of the city council was present on March 10, 1893, the adjournment without date rendered the city council as a canvassing board *functus officio*. It has been decided by this court, time and time again, that the courts have jurisdiction in *mandamus* to control a canvassing board, "whether the board be a township, a city, a county or a state board," if the board wrongfully neglects or refuses to canvass all the returns present. Again, if a canvassing board has wrongfully or improperly adjourned *sine die* without performing its duty, the courts may compel it to reassemble and make a correct

6. Canvassing
board—
its duties.

canvass of all the returns before it. A writ of *mandamus* is only issued to compel the performance of an act which the law enjoins as a duty. (*Lewis v. Comm'rs of Marshall Co.*, 16 Kas. 102; *Rosenthal v. State Board of Canvassers*, 50 id. 129; *In re Gunn, Petitioner*, 50 id. 155.)

As there was no quorum of the city council on March 10, 1893, when it met for the purpose of canvassing the returns of the election, the council might have adjourned to some subsequent time to complete the canvass; but as it adjourned without day, and without performing any of its duties, the mayor had authority to call a meeting of the council, and that body, in the performance of its duty, notwithstanding its former adjournment, had the power to canvass the returns and declare the result.

All the other objections to the issuance of the bonds have been considered, but overruled.

The peremptory writ of *mandamus* will be issued as prayed for.   The judgment will carry costs.

All the Justices concurring.