STATE ex rel PRCHAL, Appellants, v. DAILEY, et al, Respondents.

(234 N. W. 45.)

(File No. 7100. Opinion filed January 3, 1931.)

*E. M. Starcher,* of Fairfax, and *Sutherland, Payne & Linstad,* of Pierre, for Appellant.

*M. Q. Sharpe,* Attorney General, *Benj. D. Mintener,* Assistant Attorney General, *F. D. Wicks,* of Scotland, S. D., *W. H. Farmer,* of Madison, and *Bailey & Voorhees,* of Sioux Falls, for Respondents.

BURCH, J. In 1881 the Dakota Territorial Legislature passed chapter 99, Session Laws of 1881. That part of said chapter material to the issues in this case provides:

"That a Normal School for the Territory of Dakota be established at Madison, in Lake County, D. T., the exclusive purpose of which shall be the instruction of persons both male and female in the art of teaching and in all the various branches that pertain to a good common school education; also to give instruction in the mechanical arts and in husbandry and in agricultural chemistry, in

the fundamental laws of the United States and in what regards the rights and duties of citizens." Section 1.

By a similar provision chapter 100 of the same Session (section 1) provided for a normal school at Spearfish, Lawrence county, and chapter 101 (section 1) provided for a normal school at Springfield, Bon Homme county. The purpose declared in the original act has been carried forward in all subsequent legislation without material change and now appears as section 5611, Rev. Code 1919. During territorial days the schools were under the direction of a board of education. At the beginning of statehood the control of the schools was conferred upon the Regents of Education by the Constitution. The Constitution, article 14, § 3, as amended in 1896, provides:

"The state university, the agricultural college, the normal schools and all other educational institutions that may be sustained either wholly or in part by the state shall be under the control of a board of five members appointed by the governor and confirmed by the senate under such rules and restrictions as the legislature shall provide. The legislature may increase the number of members to nine."

The regents in the exercise of their control over these normal schools have provided a course of study for the training of teachers to qualify them to teach in the grade schools below the high school, and this course may be fairly said to be within the declared purpose for which the schools were created. We do not understand that there is any serious issue as to the authority of the board to prescribe the curricula of the schools so long as they are confined to training teachers for teaching in the public schools of the state below the rank of high schools. But the regents have prescribed additional curricula for these schools leading to advanced degrees, have changed the names of the schools designating them as colleges, and have established them as teachers' colleges authorized to teach a college course and to train teachers qualified to teach in the high schools and other higher institutions of learning. We think the issues are sufficiently apparent when we say that none of these schools are confined exclusively to the training of teachers for the common schools below the grades of high schools.

Relator, claiming that the regents have exceeded their authority in making of these normal schools, teachers' colleges, brings

this action in prohibition to prevent a continuance of such unauthorized acts. The learned trial judge denied the writ, and relator appeals.

Without regard to technical accuracy, we will for convenience in this opinion refer to public schools below and including the eighth grade, as grade schools, and those above as high schools. When speaking of courses of study, taught in higher institutions of learning we will speak of them as college courses.

Before discussing the issues involved in this case, a few general observations may be of use in understanding and applying the principles necessary to a correct solution of the case. Education has always held a high place in the minds of the people of this country. Our state Constitution (article 8, § 1) provides:

"The stability of a republican form of government depending on the morality and intelligence of the people, it shall be the duty of the legislature to establish and maintain a general and uniform system of public schools wherein tuition shall be without charge, and equally open to all; and to adopt all suitable means to secure to the people the advantges and opportunities of education."

In State ex rel. Eveland v. Erickson, 44 S. D. 63, 182 N. W. 315, 13 A. L. R. 1189, Judge Whiting speaking for this court (page 68 of 44 S. D., 182 N. W. 315, 316) said, "During the whole history of our nation, religion and education have been recognized as the foundation pillars of American civilization." Naturally education holding so important a position has been the subject of a great deal of legislation, and many changes have been made in the laws from time to time to meet new conditions. What would have been considered a good average education in 1881 would not be so considered today. Standards of education have advanced, and methods of teaching have changed. But we think it is elementary that the people through their Legislature and the Constitution have a right to control and prescribe the limits to which they will go in supplying education to the children and youth of the state at public expense. Neither educators nor administrative boards can expend public funds for education, unless the education for which it is expended is authorized by law. If that is true, we must look to the Constitution and the statutes of this state for the authority of the regents to maintain the normal schools involved in this action as the teachers colleges. The affection of the people for

education and the history of its advance are important in constru-
ing the statute, but not important as a reason for upholding the
acts of the regents if such acts are not authorized by the statutes
when properly construed. Any need for advanced courses in these
schools may be urged upon the Legislature as a reason for more
legislation, but not upon this court to sustain the action of the
regents. The question before us is: Are they authorized?

Since the regents have greatly advanced the courses of study
that may now be pursued in these schools, over the courses pre-
scribed in their earlier history, and since these courses are not
obviously within the purpose for which the schools were declared
to have been established in the enactments creating them, we turn
first to the arguments of respondents by which they seek to sustain
their conduct.

■ ■ Respondents' first contention is that under the Consti-
tution this action cannot be maintained. They argue that the "con-
trol" of the institutions necessarily includes the power to prescribe
their curricula. Conceding for the sake of argument that this is
true, it does not necessarily follow that curricula foreign to the
purposes for which the schools were established can be prescribed.
The curriculum of a school very largely determines its character.
No one would contend that the regents may create and establish
state schools and colleges at will. Suppose the regents were to
prescribe that the curricula of all the schools and colleges of the
University be followed and taught in the State College of Agri-
culture and the curriculum of the State College be followed and
taught at the University, might they not be justly charged with
having moved the University to Brookings and the State College
to Vermillion? No one would contend that could be done under
the guise of prescribing the curricula of the schools. The curricu-
lum must conform to the character and purpose of the school.

■ But it may be suggested that where the course of study
is appropriate to fulfill and conform to the purpose it is not subject
to objection because it goes further and supplies an opportunity
for more education than is required by the state to teach a grade
school so long as those desiring to qualify for a grade school only
are not required to take the additional courses. But the answer
is that the additional courses may amount to the creation of another
and higher school. We think it must be conceded that these nor-

mal schools, although they may properly be classed as normal schools within the restricted meaning contended for by relator, are also now teachers' colleges. Unless they were created colleges or created capable of becoming colleges by the statutes of 1881, they have been so created by the regents. There is no direct specific subsequent legislation to effect that change, and since the regents have no power to establish schools or colleges, their action cannot be sustained unless authority therefor can be found in the Constitution, the acts creating the schools, or in general legislation prescribing the duties and powers of the regents.

■ The Constitution places these schools in "control" of the regents "under such rules and restrictions as the legislature shall provide." Respondents cite State v. State Board of Education, 33 Idaho, 415, 196 P. 201, 205, and Board of Regents v. Auditor General, 167 Mich. 444, 132 N. W. 1037, to support their view that the regents under the Constitution are supreme in all matters pertaining to the management of the schools. Those cases involved the expenditure of money belonging to the state university. In Idaho the question was whether the regents might expend the funds independent of the audit of the state board of examiners (a board for the audit of all claims against the state), and it was held claims against the regents were not claims against the state and the regents could expend the funds of the University and audit their own claims without interference from the board of examiners. It is said in the Idaho case: "The Board of Regents is a constitutional corporation with granted powers, and while functioning within the scope of its authority is not subject to the control or supervision of any other branch, board or department of the state government." In the Michigan case the question was whether the judgment of the Auditor General or that of the Board of Regents should prevail in the expenditure of money appropriated by the Legislature for the University. The court held that the regents had control of the expenditure of the fund, but said if the appropriation was made upon any conditions, those conditions must be complied with if the regents accepted the appropriation. The extent of the regents' control of the funds of the schools under their control has never been squarely before this court, but in Johnson v. Jones, State Auditor, 52 S. D. 64, 216 N. W. 584, we held that while it was competent for the auditor to question the authority of the regents to

make an expenditure, he could not substitute his judgment as to its propriety. There is nothing in these cases to support the view that the regents are supreme in control of the curricula of the schools. And though it be conceded the regents have very broad powers in respect to the curricula of the schools·under their control, it is self-evident they cannot by the exercise of that power change their character.

The second contention of respondents is that a writ of prohibition should not issue. They say such writ is discretionary and ought not to issue if the regents have acted honestly and in good faith in an honest exercise of a discretion legally vested in them. Conceding this to be sound, the court is not at liberty to refuse the writ if the acts complained of are not within a legally vested discretion. If the acts are unauthorized, the good faith with which they are performed cannot authorize them. As heretofore intimated, the regents have no authority or discretion in creating and establishing schools. No matter how much they may see the need of teachers' colleges to train teachers for schools above grade schools, they cannot create such schools, but must present their needs to the Legislature and obtain such schools by legislation or go without.

Respondents' third contention that the facts do not warrant the issuance of the writ presents the chief and most difficult issue in the case.

We have quoted the statute declaring the purpose of these schools, and it remains to be seen if the declared purpose does restrict them to the training of teachers for grade schools only. At the time the schools were created in 1881, normal schools were known to the educational system of this country. In the Fourteenth edition of the encyclopedia Britannica, vol. 21, p. 862, it is said: "Teacher training schools in the United States, exclusive of departments of education in colleges and universities, fall into five general classes; State normal schools, State teachers' colleges, city normal schools and teachers' colleges, county normal schools and high schools and private normal schools." This classification indicates there is now a recognized distinction between normal schools and teachers' colleges. Further in the same article Britannica says: "Normal schools were established for the purpose of training teachers for the common schools, which generally

meant the ungraded schools." The purpose of these normal schools declared by our statute is to instruct in the art of teaching and in all the various branches that pertain to a "common school" education, with certain other specifically enumerated subjects. If the words "common school" then referred to ungraded schools, and restricted the branches to be taught to those that pertain to such schools, those words now must refer to the present so called grade schools, as such schools now occupy the same place in our public school system as the ungraded schools then did. If that is the construction to be placed upon the statute, these normal schools were orginally established for the exclusive purpose of training teachers for the common schools as then known and for the grade schools as now known. Tracing historically the rise in rank of some of the normal schools, we find in Britannica this summary: "The rise of many normal schools to the rank of teachers' colleges was a natural result of the development of education and especially of the remarkable growth of the high school. From the very first some of the normal school graduates, especially in the middle west found their way into high schools; entrance requirements were gradually advanced, and in some the curriculum was extended to four years. In 1893 the Normal school at Albany became the Albany State Teachers' College and began to confer degrees. In 1897 the Michigan State Normal School became the Michigan State Normal College and was given the power to grant degrees. Other states in the middle west soon followed." Whether any change in rank was effected in other states without specific legislation we do not know. We have made some investigation and found specific legislation. We have found no case in which the raise in rank without legislation has been effected and sustained by the court, and no such case has been called to our attention. We can see very good reasons for holding it cannot be done. New York state has one or two normal colleges and many normal schools. Other states have both normal schools and normal colleges. If a normal school can be permitted to rise to the rank of a college without legislation, the natural ambition of the school managers might result in all the normal schools of a state becoming colleges and completely wipe out the normal schools. The grade schools are a very important part of our public school system. They are the schools guaranteed by our Constitution and the ones that the Legislature by that instru-

ment is required to maintain. Teachers for such schools must be paid at public expense, no tuition can be charged, and the state is vitally interested in supplying a full quota of trained and qualified teachers. That may properly be the first concern of the Legislature and its right to supply and train such teachers cannot be denied. It may be said a teacher qualified to teach in the high schools is just as well qualified to teach a grade school. Maybe so, but unless the same wage level prevails in both schools it cannot be expected that a high school teacher will accept employment in a grade school. To qualify a grade school teacher for teaching in the high schools or higher educational institutions, including private and highly endowed colleges, may result in a great shortage of teachers for the grade schools. It may also be a debatable question as to whether a qualified high school teacher is as well qualified to teach a grade school as one trained for that purpose. Educators have recognized the need of specially trained primary teachers, and it may be there is a need for specially trained grade school teachers. It is quite conceivable that education might be advanced by a high scale of wages in the higher institutions of learning securing the highly trained professional educators and a lower wage scale in the grade schools where less learning but special training is required, than by an attempt to reach a high professional standard for all schools with uniform wages. An adequate professional wage scale in all the grade schools might be prohibitive in cost, while an inadequate wage to the highly trained professional might drive such teachers to other more lucrative occupations and the value of their services be lost to the state. It is not plain that specializing in educational work is undesirable. Where there can be an honest difference of opinion as to the proper course to pursue, the adoption of the course becomes a matter of policy. It is for the Legislature to determine the educational policy of the state, not for this court or the regents.

But respondents are not content to construe the words "common school" as synonymous with grade school, but take the position that "common school" means public schools and that a high school is as much a part of the public school system as a grade school. There is some force to this argument when it is considered that the ungraded schools in 1881 composed nearly all of the public school system, and "common school" was a term prac-

tically as broad when limited to ungrade schools as when extended to include the whole public school system. Because of this it is now more difficult to determine what was intended by the term, but the fact that the term in either sense was then co-extensive in meaning does not determine its meaning in favor of respondents' position. Other facts may determine the true sense and point the way to a correct interpretation. All or nearly all of our high schools in this state have been established since 1881, but have always been recognized as a distinct class of public schools known and designated as high schools. And when we consider that higher education, though now a part of the public school system, has taken distinct form and advanced under a distinct classification within that system without materially affecting elementary school classification, we think the term "common school" must adhere to the elementary schools secured by the Constitution and cannot be extended to include other schools adopted later and incorporated in the public school system as a specific class. This is especially true where to give the term a more comprehensive meaning would be to remove all restrictions upon the activities of these normal schools and make of them colleges not only for the training of teachers but for the instruction of all pupils who desire a college education.

■■ ■ Respondents cite Dickinson v. Edmondson, 120 Ark. 80, 178 S. W. 930, Ann. Cas. 1917C, 913; Richards v. Raymond, 92 Ill. 612, 34 Am. Rep. 151; Stuart v. School Dist., 30 Mich. 69; and Board of Education v. Welch, 51 Kan. 792, 33 P. 654, to show that the meaning of the words "common school" is not confined to grade schools, but that high schools may be a part of the public school system for providing a good "common school education." But the cases cited involved the constitutional right of the Legislature to create and maintain high schools as a part of the public school system under a Constitution providing for common schoools. In those cases the word "common" has been held to be synonymous with "public" and to refer to education and schools open to the public as a whole and supported by general taxation. Obviously no such meaning can be given to the word "common" when used to express a class of public schools. The power of the Legislature to maintain high schools, or even colleges and a university, by funds derived from taxation, has never been questioned in this state.

Should the right of the Legislature to maintain high schools, vocational schools, or other special schools as a part of the public school system be questioned, or the right to use any part of the permanent school funds derived from school lands, escheats, and other sources provided by law for the support of such schools be denied, the cases above cited would merit very careful consideration, but they have no application to the precise question now before us. The question before us does not involve the power of the Legislature to create teachers' colleges. The question is: Has the Legislature done so? Recognizing the right of the Legislature to maintain, if desired, normal schools for the training of grade school teachers only and finding a statute which in its inception created only such schools, it cannot be extended to create teachers' colleges unless the language used anticipates the change. There is no such language. If the Legislature desires, it is a simple matter to expressly create one or more teachers' colleges in this state. There should be no strained construction of the statute to effect a result so easily obtained by plain enactment if needed or wanted. In section 7511, Rev. Code 1919, the Legislature has plainly used the words "common schools" as descriptive of elementary schools, a class of schools below the grade of high schools. We do not attempt to define their meaning in all statutes, but confine our interpretation to the statute under consideration. We are forced to conclude that the exclusive purpose of these normal schools is the training of teachers for grade (elementary) schools, or that there is no limit to their activities in the training of teachers for public or private schools or any institution of learning. To hold there is no limit would defeat the original intent of the statute to at most confine the schools to the training of teachers for public schools. By holding that the exclusive purpose declared is a real limitation we leave the growth of these schools to the Legislature, while if we hold otherwise for all practical purposes we take the control from the Legislature. To construe the statute as fixing no limit in the face of the language would be unreasonable. To fix any other limit than heretofore indicated would be arbitrary. We think the statute, while not entirely plain, was originally intended to establish normal schools as then known and understood (namely, schools for the training of teachers for elementary schools), and that the functions of such schools did not then

include the training of high school teachers; that though the high school has since become a more common and important branch of the public school system, there is nothing in the statute covering or contemplating such growth, so that at this time such schools can fairly be said to have been included in the declared purpose.

██ ██ Finding no authority for the acts of the regents in the Constitution nor in the act creating the schools, it remains to be seen if the general statutes prescribing the powers and duties of the regents give such authority. Sections 5562-5587, Rev. Code 1919, prescribe the duties and powers of the regents. The section most strongly relied upon by respondents is section 5575, providing:

"The board of regents shall have power to establish such departments and courses of study, in the institutions under its control, as it may think best, to determine what text books shall be used, what requirements for the admission and graduation of students shall be maintained, what rules shall be enacted and enforced for the government of students, and such board shall have power to make all other rules and regulations for the wise and successful management of the schools under its control; and to delegate, provisionally, to the president, dean, principal or faculty of any school under its control, so much of the authority conferred by this section as in its judgment seems proper and in accordance with the usual custom in such cases."

But this section must be construed in connection with the other sections cited above, and when so construed it is plain the power to establish departments and courses of study are limited to the needs of the schools in effecting the purpose for which they are maintained. Section 5573 provides, in part:

"Except, as otherwise expressly provided in this code, the board of regents shall have power to govern and regulate each institution under its control in such manner as it shall deem best calculated to promote the purpose for which the same is maintained."

And the last sentence of section 5578 provides:

"The board shall at all times so administer the schools as to enable each one of them to do in the best manner its own specific work, with a view to the strictest economy, and so as to unify and harmonize the entire work of all the schools under its control."

These provisions plainly fix the limits of the powers granted the regents. We do not find anything in the legislation that can fairly be said to delegate power to the regents to change the purpose, character, or scope of any school under their control.

Respondents submitted an able brief and it has received careful consideration. They cover the history of school legislation, point to the statutory requirements for teachers' certificates, and make a point of a statute permitting the introduction of high school subjects in some rural schools where ordered by the school board, in which event a higher grade certificate is required than in grade schools where such subjects are not taught. They review normal school legislation and call particular attention to legislative appropriations for these normal schools which they claim indicate an assent by the Legislature to the changes made by the regents. And they point to a time when relator in the state senate made an unsuccessful attempt to secure legislation restricting the curricula and the course of these normal schools to two years. But we find little in the history of legislation to aid us. The requirement that grade schools which include high school subjects must employ teachers with high school qualifications does not support the contention that normal schools restricted to training teachers for the grade schools can also train high school teachers. The statute requiring a higher certificate for the mixed school giving both grade and high school courses is a restriction on the school boards of such schools. It does not confer additional duties and powers upon the normal schools. There is nothing to indicate the Legislature did not intend such boards to get their teachers from the same source as the high schools. Concerning the appropriations they do not amount to an amendment of the statute creating the schools. At most they merely show an interpretation or an acquiescence in an interpretation of such statute contrary to the expressed purpose. But we do not think an appropriation in the general appropriation bill amounts to an interpretation. It amounts to no more than an acquiscence in the unauthorized act for the time being without objection.

Under the subject "Art of teaching," respondents say "the art of teaching" calls for and requires proper instruction in all of the subjects which a student in the normal schools may be required to teach in the public schools. This is not obvious.

It might well be that a teacher entering a normal school for training could be required to possess such knowledge before being allowed to enter. Many professional schools do require some education before matriculation in such schools. Law and medical schools require learning in college courses not offered by them but which must be acquired elsewhere. The art of teaching as a professional course may alone cover a considerable field, but we cannot see why it need cover any subject to be taught. In the statute the art of teaching is recognized as distinct from the subject to be taught. Subjects that pertain to a common school education are easily ascertained by recourse to the grade school course. The argument that the teacher of a grade school will be greatly improved by a college education and that the background furnished by such an education will be of such benefit as to warrant its requirement by the regents is not tenable. To sustain that contention would be to remove all restrictions and leave the regents supreme in prescribing the qualifications for teachers. The Legislature has in the past and does now prescribe the character of the certificate to entitle one to teach a grade school. The regents cannot increase those requirements. These normal schools being established for the exclusive purpose of training grade school teachers cannot be used in whole or in part to train high school and other teachers without legislative authority. Such authority we do not find. It is not an answer to say a teacher trained and qualified to teach a high school is also qualified under the statute to teach a grade school. As heretofore indicated, the welfare of the common schools may be in the opinion of the Legislature better protected by providing a large supply of well qualified and highly trained teachers for such schools who are not qualified to teach elsewhere and who if they teach must teach in the grade schools. If the Legislature should be of this opinion, it would certainly have a right to establish schools for that purpose. These schools have been established by the terms of the act for an exclusive limited purpose, and without legislative action such purpose cannot be enlarged. We realize the impracticability of confining the curriculum of any school to hard and fast rules. The curriculum of these schools must be largely within the discretion of the regents. The limits within which the discretion must be exercised will be readily discerned if the regents will bear in mind that these schools are teacher training schools

for grade school teachers. If the present one or two year courses are sufficient to qualify teachers for such schools, that is all that should be given. But there can be no reason why such courses shall not conform to the first years of a teachers' college so that students taking the first years in these schools shall receive credit therefor if they afterwards pursue a higher education in the college. No one questions the good faith of the regents in what they have done in raising the rank of these schools. Equal good faith in reducing their rank to the limits prescribed by statute ought to be accomplished without difficulty or disputes.

The judgment and order appealed from will be reversed. Entry of judgment however will be deferred to July 1, 1931, pursuant to the suggestions contained in the concurring opinion of CAMPBELL, J.

BROWN, P. J., and POLLEY and SHERWOOD, JJ., concur.

CAMPBELL, J. (concurring specially). I concur for the most part with the language of the foregoing opinion and with the substance of the conclusions reached. Conceding the broadest discretion to the board of regents in the performance of their functions, nevertheless the statutes relating to institutions for higher education are not mere nullities, and all of them must be considered in interpreting any of them. The broad language of section 5575, Rev. Code 1919, stating that the board of regents "shall have power to establish such departments and courses of study, in the institutions under its control, as it may think best," must be construed with and as limited by the language of the legislative enactments setting forth specifically the purpose of the respective educational institutions, such as section 5589, Rev. Code 1919, setting forth the purpose of the University; section 5597, Rev. Code 1919, setting forth the purpose of the State College of Agriculture and Mechanic Arts; section 5611, Rev. Code 1919, setting forth the purpose of the three normal schools involved in this proceeding; section 5615, Rev. Code 1919, setting forth the purpose of the Northern Normal and Industrial School; and section 5617, Rev. Code 1919, setting forth the purpose of the School of Mines.

Concededly the board of regents is a constitutional body, but it is a constitutional body created under section 3, art. 14, Con-

stitution S. D. (as amended), to control the higher educational institutions "that may be sustained either wholly or in part by the state * * * under such rules and restrictions as the legislature shall provide." And the board of regents has no power to create or establish institutions of learning in this state. No one would suppose that the board of regents could by their sole act create and establish at some city in this state an entirely new school—for instance a school of chiropractic to be operated and maintained at the public expense. No more could they accomplish that result indirectly by invoking section 5575, supra, and under its broad terms ordaining to be taught at the State School of Mines, whose purpose is quite otherwise specified by section 5617, Rev. Code 1919, courses in chiropractic, the successful accomplishment of which would render the student eligible for examination as a chiropractor under chapter 143, Laws 1921.

As to each educational institution under the control of the regents, it must be held that the general scope of the powers of the board as to courses of study and the kind, type or nature of school that shall, in fact, be maintained, are limited by the foundation purpose of the school as prescribed by the Legislature. Within those limits the discretion of the board of regents is vast and subject to little, if any, control. Beyond those limits there is no question of controlling discretion. There is an utter lack of power and authority to act. Either the limit is there or else no limit of any sort conceivably exists.

Educational institutions in the United States have customarily been discussed, spoken of, and considered under three groups: First, the elementary schools, which include the ungraded schools and the first eight grades of a graded school system; next, the secondary schools, which embrace the high schools, or the ninth to twelfth grades of a graded school system; and, lastly, the institutions of higher learning, which include normal schools, colleges, universities, etc. The term "common schools" has sometimes been used as synonymous with "public schools" and has included the elementary and secondary schools, and even occasionally such of the higher schools as are supported by public funds; but this is comparatively an infrequent use of the term and one which I think should not be construed to be intended unless the context quite clearly demonstrates such intention. In ordinary parlance it is cus-

tomary to use the phrase "common schools" as synonymous with elementary schools and exclusive of secondary or high schools. The purpose of the normal schools involved in this proceeding, as now set forth in section 5611, Rev. Code 1919, has come down through the statutes without change from the date of the establishment of the schools in 1881, as pointed out in the majority opinion, and the fundamental purpose of such schools as prescribed by law is, and has always been I think, to train teachers for the common or elementary schools.

At the time these schools originated, there were but few secondary schools in the territory. There was neither need nor demand for teachers for secondary schools. Chapter 9, Private Laws 1874-75, approved January, 1875, created a board of education for the city of Yankton with authority to establish "such and so many schools as they deem necessary, etc." By 1876 the school system at Yankton included one year of high school work. When the normal schools here involved were established, the few high schools in the territory (probably not more than five and none complete) were independent creatures of special legislative act entirely unconnected with the state common school system both as to origin and control. See Powers, "History of Education in Dakota Territory," in the Fourteenth Biennial Report of Superintendent of Public Instruction of South Dakota 1918, pages 19-35. See also "History of Public Education in Dakota," Ludeman (1924) XII Collections Department of History South Dakota, page 375. In 1886 in the Seventeenth Annual Report of the Superintendent of Public Instruction of the Territory of Dakota, at page 13, the distinction between the common school and the high school as understood by educators of the day was plainly recognized by the superintendent when he said:

"In my last annual report I suggested that authority be delegated to each township * * * to establish a central high school * * * and that it be made a connecting link between the common schools and the university. * * * While the state undertakes to provide for the collegiate education of our children, in addition to the common school course, there should be no break in the connection between them. No satisfactory reason can be urged for tolerating the 'missing link' which now exists."

Chapter 47, Laws Dakota 1887, consisted in part (perhaps

pursuant to the above recommendation) of a provision for township high schools, and by its language evidenced a legislative recognition of the distinction between the meaning of the phrase "common schools" and the meaning of the phrase "high schools." Section 77 of the act provided, in part:

"Whenever a school township has within and belonging to it four or more common schools * * * the township school board may submit to the voters * * * the question whether a high school shall be established and maintained for the township * * *."

Sections 120 to 151 of the act provided for public schools in cities, towns, and villages. Section 121 was mandatory in its terms and required that each school corporation under the act "shall establish and maintain a system of free common schools which shall be kept open not less than six nor more than ten months in any one year and shall be free to all children of legal school age residing within such corporation." Section 128 of the act was optional in its language and provided that the board of education of such school corporation might "establish a high school whenever in their opinion the educational interests of the corporation demand the same."

The Second Biennial Report of the Superintendent of Public Instruction, at page 12 (Pub. Doc. S. D. 1894), distinguishes between the "common school course of study" and the "high school course of study," and recommends that "at least one high school in each county should furnish free tuition to pupils who have completed the common school course of study."

One of the early meetings of the South Dakota Educational Association was held at Parker in this state in December, 1893, and a certain Friday morning of the session was devoted to department meetings, at which time the "common school department" met in one place, and the "high school department" met in a different place (Id. p. 55). That same distinction is preserved in our legislative language to the present time. As an instance, see section 7511, Rev. Code 1919, which specifies affirmatively the branches in which instruction shall be given in all "the common schools of the state," and permissively states that there may also be taught in said common schools "such other branches, including such high school subjects, as the electors of the district at the annual election may have ordered."

I can see no escape from the view that the primary purpose as stated by the Legislature in establishing these schools was the training of teachers for the common schools in the sense of the elementary schools; and up until 1918 or thereafter there seems to have been no effort to do more than that in the schools in question. Chapter 226, Laws 1917, authorized an educational survey in this state in connection with the United States Bureau of Education, which survey was subsequently made by experts provided by the bureau, and, in the report of that survey (Bulletin, 1918, No. 31, Department of Interior, Bureau of Education), at page 222, the survey committee as a result of its observations says:

"The state board of regents of education have also followed a consistent policy of limiting the major activities of the normal schools to the large elementary field in education and the other higher state schools to the secondary field. * * * The largest and in many respects the most important function of normal schools is to prepare an ample number of rural and other elementary school teachers."

But said survey report announced also a premise with which I am entirely unable to agree, when it stated (also on page 222):

"Neither the normal schools nor the other higher state schools are limited by the legislative acts creating them to preparing a specified grade or grades of teachers."

Shortly after the time of that report, and perhaps not entirely uninfluenced thereby, a movement seems to have been inaugurated to translate the normal schools (properly so called) into teachers' colleges, which are institutions of broader scope, function, and purpose, as pointed out in Judge BURCH'S opinion. The Eighteenth Report of the Regents of Education states (page 2):

"In order to meet the demands for teachers of more advanced training all normal schools are or will be organized as teacher colleges. We therefore recommend that the name normal school be dropped and that in the future they be known as teacher colleges."

In the Nineteenth Biennial Report of the Regents of Education (page 70) is printed a report made to them by the head of one of the educational institutions of this state dealing with the change from normal school to teachers college in the following language:

"The United States maintains 178 publicly supported teachers colleges and normal schools at this writing. Ten years ago practically all of these institutions were two-year normal schools. Since then a most remarkable upward evolution of the training schools has come about. A large majority of all have become converted into three and four-year teachers colleges, and unquestionably within the next few years all normal schools will be known and organized on the new basis. At the present time every state touching the borders of South Dakota has made this change. This is likewise true of most of the progressive states in the Middle West, Northwest, and South. The conservative New England group and Pennsylvania and New York are about the only sections that have not yet reorganized all their normal schools as teachers colleges."

At the Nineteenth Session of the Legislature of this state, a bill was passed (Senate Bill 48, Nineteenth Session) changing the name of all the normal schools to teachers' colleges, for example, Eastern State Teachers' College, Black Hills Teachers' College, etc., and specifically providing that said normal schools "shall become and be teachers colleges of the state with the powers, purposes and functions heretofore granted said schools by law and no others." The measure was vetoed by the Governor (Senate Journal 1925, p. 873) with the following pertinent comment:

"Apparently there is no change whatever proposed of the powers, purposes and functions which are now governing these institutions. If this be true, then why change the name.

"If on the other hand, there have been changes in the scope of work done in these institutions, or it is contemplated that there be changes in the scope of work to be done in these institutions, then that fact should have been clearly set forth in the Bill.

"If the proposed names suggest that these institutions will in the future occupy higher rank and that there is advantage in so doing, then that should be clearly set forth."

It seems to me very plain that the schools here involved were established as normal schools in the sense that they were established as schools for the primary and fundamental purpose of training teachers for the elementary schools. The Legislature has never enlarged that purpose. Nevertheless, beginning shortly after 1918 these schools have been very frankly converted and translated into

teachers' colleges, a very different institution, with no legislative authority for such conversion.

I do not think that the Board of Regents of this state can create a teachers' college by converting a normal school into a teachers' college any more than they could create a teachers' college as an entirely new institution ab initio. It may very well be that there is a need and demand in this state for teacher and other training of higher than normal school grades. It may very well be that such training ought to be furnished in a state institution and at the public expense, but that is a matter to be determined by the Legislature and by no one else. It may very well be that it is highly expedient and in every sense desirable that the teachers of this state should no longer be trained in normal schools, but should be given the broader and more intensive training that can be furnished by an institution of collegiate rank. But such declaration is for the Legislature to make. It is for the Legislature to say whether the taxpayers of this state are to support and maintain teachers' colleges, and if so, how many and where. It is beyond the power of the Board of Regents, with whatever good faith and however sincerely they have at heart the highest good of education in this state, to determine that question by conversion of the normal schools.

Just how much of the instruction now given in the normal schools is beyond the proper scope and purpose of such schools as laid down by the present statute, I do not pretend to be able to say. Some of it very plainly is, and will be admitted by respondents so to be, if the purpose statute of such normal schools imposes such limits on what may be done in such schools as it seems to me we are compelled to hold in this case that it does impose. I am entirely satisfied that if a good-faith effort is made by the Board of Regents (as of course it will be if the law as established by this case continues unchanged) to conduct, control, and maintain these schools within the limits of their purpose clause as construed in this case, the discretion of the regents in that field will be so exercised that there will be no occasion for any attempt at judicial control thereof. At the present time the Board of Regents is not attempting to operate the schools within any such limits, but is operating the schools (with equal good faith and in all sincerity and with perfect candor) upon the theory, either that the purpose

clause is no restriction at all upon the operation of the school, or if it is a restriction, that its meaning is considerably broader than we are now compelled, as it seems to me, to hold.

It is entirely possible that the best good of the state demands that some or all of these schools be operated upon the enlarged basis which the regents have now undertaken, but the responsibility for making that determination of public policy must rest with the Legislature. The Legislature will very presently be in session. The matter will undoubtedly come to their attention, and they are at liberty to enlarge the purposes for which any or all of these schools are henceforth to be maintained in such manner as they deem best.

Ordinarily judgment of this court is formally entered immediately after the filing of an opinion, but I think this court has inherent power to defer signing and entry of judgment if justice seems so to require. In the present case two factors seem to me to deserve some special consideration. The Legislature may desire to act in the matter, and their action, if any is taken, might or might not be such as to justify the employment of an emergency clause. Legislative action, if any, might therefore be effective upon passage, or July 1st next. Also, appropriations for all of these schools upon the basis upon which they are now operated was made by the 1929 Legislature (Laws 1929, c. 12), effective to the end of the present biennium. Students are attending all of these institutions, well along with the work of the academic year, and entered therein on the faith of the curricula as now advertised. It would be extremely unfortunate, if the statutory scope and purpose of all or any of these schools should be enlarged by the present session of the Legislature so as to authorize the continuance thereof upon the basis of present operation, to have a judgment of this court (or of the trial court on a remand) temporarily interfere with the operation of the schools. It would also be unfortunate to have a judgment interfere therewith, in any event, during the academic year for which pupils are now enrolled and appropriations have previously been made.

I am therefore of the view, in this particular case, that the entry of judgment upon and pursuant to the opinion of this court should be deferred until July 1st next. If, in the meantime, the Legislature sees fit to authorize a broader functioning of any or all

of these schools than the statute now permits, then to that extent there need be no interruption of work as now arranged. If, on the other hand, no legislative change is made, the work of pupils for the present academic year, who have entered the institution justifiably relying upon the furnishing of courses as presently offered, will not be seriously disturbed. Such students will be enabled to receive proper and recognized credits (acceptable in other fully accredited schools) for the work of the full academic year for which they have enrolled, and the Board of Regents will have ample opportunity to make such curricular changes as the situation may require prior to the beginning of the academic year 1931-32.

It is argued in this case that the Legislature, by enacting (section 11, c. 58, Laws 1897) the broad language now carried forward as section 5575, Rev. Code 1919, and by making appropriations for these schools biennially to permit the operation thereof upon a constantly broadening basis, has repealed by necessary implication any restriction upon the scope of these schools implicit in the original (and presently preserved) established purpose clauses. None of the judges are able to say as a matter of law that this is the effect of such subsequent legislative conduct. But if in fact that is the legislative desire, then it will be very easy to make it apparent beyond question by simple and plain statutory amendment at the oncoming session.

With a profound realization of the value and tremendous importance of higher education, nevertheless in the last analysis it must be admitted by all that the question of the extent to which, and the institutions where, the taxpayers of this state shall furnish higher education, is a matter exclusively for legislative determination. However laudable the motive and however desirable the result, the making of such determination cannot, and ought not to be, assumed by the Board of Regents by going beyond the present statute, nor by this court by interpreting the present statute vastly more broadly than we believe the enacting legislature ever intended. By deferring entry of judgment after indicating by opinion the view of the court as to the present law, the responsibility involved herein will effectively rest where it belongs—with the Legislature— and they will have ample opportunity to meet the problem squarely and determine it pursuant to the authority that with them lies (and not elsewhere) before any actual disturbance of the present status

quo. Being fully advised as to this court's construction of the present law, and also fully advised as to the present conduct of these schools, the Legislature will be afforded every opportunity, if they so desire, to amend the law to correspond to the operating conditions, and make such change effective before the decision of this court results in any interference with present operations. More, this court, in my view of the law cannot do—less I think it should not do.