STATE ex rel BRYANT, et al, Plaintiffs, v. DOLAN, et al, Defendants.

(249 N. W. 923.)

(File No. 7579. Opinion filed September 9, 1933.)

C. C. *Caldwell,* of Sioux Falls, *Max Royhl,* of Huron, and *Byron S. Payne,* of Pierre, for Plaintiffs.

*Walter Conway,* Attorney General, *B. D. Mintener,* Assistant Attorney General, *Robert D. Jones,* of Milbank, *Denu & Philip,* of Rapid City, and *B. H. Schaphorst* and *Philo Hall,* both of Brookings, for Defendants.

BECK, Circuit Judge. This is an original proceeding brought by the relators in the name of the state of South Dakota to restrain the defendants as the board of regents of the state of South Dakota from discontinuing the courses of general and professional engineering and home economics at the State University at Vermillion; and also to restrain said defendants, as such board, from continuing the course of general or professional engineering at the School of Mines at Rapid City; and also to restrain said board from continuing the course of general or professional engineering, a school of pharmacy, and certain courses in arts and science at the College of Agriculture and Mechanic Arts at Brookings. The relators in their application for a restraining writ allege, in effect, that the educational institutions affected by this proceeding are in part supported by revenues derived from general taxation; that the course adopted by the board of regents in the management of said institutions, and particularly in the establishment of the curricula for the said institutions, will result in an unlawful expenditure of public moneys and in waste; that the matters involved are of great public interest and involve the rights and interests of the entire state and of the people thereof; that they have requested the Attorney General to institute this proceeding, but that he has declined and refused to do so.

The defendants challenge the jurisdiction of this court to hear and determine this proceeding under the showing made by the relators, and also assert that the relators have not sufficient interest, financial or otherwise, in the subject of the action or proceeding to give them any standing in this court.

Under the decisions of this court in White Eagle Oil, etc., Co. v. Gunderson, 48 S. D. 608, 205 N. W. 614, 43 A. L. R. 397; State ex rel Prchal v. Dailey et al, 57 S. D. 554, 234 N. W. 45, 48; State ex rel Schilling v. Menzie et al, 17 S. D. 535, 97 N. W. 745, and State ex rel Adkins v. Lien et al, 9 S. D. 297, 68 N. W. 748, we are inclined to the view that this court has jurisdiction under the facts here alleged and established to hear and determine the issues presented in this case, and we think we should exercise such jurisdiction.

Many of the issues before the court in this case were considered by it in the case of State ex rel Prchal v. Dailey et al, supra, and we believe that case furnishes rules of law by which the record

under consideration should be measured and the issues arising thereunder determined. In the majority opinion, written by the late Judge Burch, the legal effect of the purpose statutes, constituting the charters under which our institutions of higher learning are mantained and conducted, is stated as follows: "And though it be conceded the regents have very broad powers in respect to the curricula of the schools under their control, it is self-evident they cannot by the exercise of that power change their character."

In a special concurring opinion one of the judges of this court states the legal effect of the so-called "purpose statutes" in more concrete form as follows: "As to each educational institution under the control of the regents, it must be held that the general scope of the powers of the board as to courses of study and the kind, type, or nature of the school that shall, in fact, be maintained, are limited by the foundation purpose of the school as prescribed by the Legislature. Within those limits the discretion of the board of regents is vast and subject to little, if any, control. Beyond those limits there is no question of controlling discretion. There is an utter lack of power and authority to act. Either the limit is there or. else no limit of any sort conceivably exists."

In view of the law as stated in the Prchal Case from which the above is quoted, the ultimate determination of this case must depend upon the construction to be placed upon the statutes declaring the purposes of the educational institutions involved in this proceeding, together with a construction of the legislation, state and federal, pertaining to "land grant colleges," hereinafter discussed.

It is conceded by the pleadings that the defendants have discontinued the courses of general or professional engineering and home economics at the State University, and that said defendants are continuing the courses complained of at the School of Mines and the State College, with one or two exceptions not here material, for the same have been abandoned, so a detailed statement of the facts involved in this case is unnecessary.

Before attempting to analyze and construe the purpose statutes constituting the charters under which the educational institutions in question are now operating and in response to arguments of counsel, a few general observations may not be out of place. It must be borne in mind that South Dakota, contrary to the course pursued by many of her sister states who maintain their universi-

ty and agricultural college upon the same campus, has elected to establish and maintain a system of higher education, exclusive of normal schools and teachers' colleges, consisting of three distinct units located at widely separated points in the state. This is pre-eminently an agricultural state; agriculture and those pursuits closely related to it constitute the major industries of the state. The only justification for the expenditure of public money for the support of institutions of higher learning is that such institutions are potent agencies in the training of our young people for the duties and responsibilities of life. Colleges and universities, if they are to be of practical value, must serve the day and age in which we live. It is a matter of common knowledge that our country as a whole, as well as the world at large, has made the most rapid progress during the past twenty-five years, in science, invention, and industry, ever achieved during any like period since the dawn of civilization. Science is the force that leads the way in almost every line of human endeavor, and plays a large part in mechanical arts and the field of agriculture in this day and age.

The authority of the board of regents is grounded upon the provisions of section 3 of article 14 of the Constitution of this state, which as now amended reads as follows: "The state university, the agricultural college, the normal schools and all other educational institutions that may be sustained either wholly or in part by the state shall be under the control of a board of five members appointed by the governor and confirmed by the senate under such rules and restrictions as the legislature shall provide. The legislature may increase the number of members to nine."

In response to the mandate contained in the foregoing constitutional provision, the Legislature enacted section 5562 of the Revised Code 1919, placing our institutions of higher learning under the control of a board of regents. The only limitation upon the power of the regents is contained in section 5578, Rev. Code 1919, which provides as follows: "The board of regents is expressly forbidden to continue or to create chairs, departments, laboratories, libraries, or other equipment in multiplication, except where the obvious needs of the special work of the schools make such multiplication necessary. The board shall at all times so administer the schools as to enable each one of them to do in the best manner its own specific work, with a view to the strictest economy, and so as

to unify and harmonize the entire work of all the schools under its control."

It will be noted that "multiplication" is permitted where the obvious needs of the special work of the school make such multiplication necessary.

The plaintiffs and relators first ask that the regents be restrained from discontinuing the general and professional courses of engineering and home economics at the State University at Vermillion.

The purpose of the State University is declared by section 5589, Rev. Code, 1919, as follows: "The purpose of the university shall be to provide the best and most efficient means of imparting to young men and women on equal terms a liberal education and thorough knowledge of the different branches of literature, the arts and sciences, with their varied applications."

There is no mandate in the foregoing statute requiring the regents to include in the curriculum of the State University the general and professional courses of engineering and home economics. The propriety and desirability of giving such courses at the State University may be conceded; but, as to the wisdom of so doing under present financial and general economic conditions, that is a matter to be determined by the Legislature and the board of regents. No judicial question is presented upon this branch of the case.

The plaintiffs and relators also ask this court to restrain the regents from continuing at the School of Mines, in Rapid City, "general and professional courses in engineering, to wit: civil engineering, electrical engineering and chemical engineering."

Section 5 or article 14 of the state Constitution provides as follows: "The legislature shall provide that the science of mining and metallurgy be taught in at least one institution of learning under the patronage of the state."

The School of Mines was established in 1885 before statehood. The first purpose statute was enacted in 1885 by the territorial Legislature, being chapter 133 of the Session Laws of 1885. Section 1 of that statute provides: "That a School of Mines for the Territory of Dakota be established at Rapid City in Pennington County, Dakota Territory. It shall be the object of such School of Mines to furnish facilities for the education of such persons as

may desire to receive special instruction in chemistry, metallurgy, mineralogy, geology, mining, milling, engineering, mathematics, mechanics, drawing, the fundamental laws of the United States and the rights and duties of citizens."

Upon admission of South Dakota into the Union as one of the states, in obedience to the mandate contained in the constitutional provision above quoted, the School of Mines was continued as one of the higher educational institutions of this state. The statute passed by the Legislature of this state and now in force declaring the purpose of the School of Mines, section 5617, Rev. Code 1919, provides as follows: "It shall be the purpose of the school of mines to furnish facilities for the education of such persons as may desire to receive special instruction in chemistry, metallurgy, mineralogy, geology, mining, milling, engineering, mathematics, mechanics, drawing, the fundamental laws of the United States, and the rights and duties of citizens."

It will be noted that both the territorial and the state statute contain the same language. For forty-seven years general engineering courses have been given at the School of Mines under the provisions of said statutes. The construction placed upon these statutes and acted upon by the people of the territory of Dakota and the state of South Dakota and their governmental agencies for so long a time is a matter that should be considered in construing the statute under consideration at this late date. Superior Lodge, Degree of Honor, v. Van Camp, 40 S. D. 142, 166 N. W. 545; Garr, Scott & Co. v. Sorum, 11 N. D. 164, 90 N. W. 799; Barrett v. Stutsman County, 4 N. D. 175, 59 N. W. 964.

The purpose statute constituting the charter of the School of Mines designates engineering as one of the courses to be given at such school. The term is not qualified; it is used in its broadest sense. We are of the view that general engineering is within the expressed purpose of the statute. Then, too, it is a matter of common knowledge that the field of mining has so rapidly developed during the past decade that a full course in engineering is now essential if a young man is to secure a desirable position in the field of mining engineering and general mining operations. The school, if it is to be of any practical value, should continue to serve the purpose for which it was established.

We conclude that in including in the curriculum of the School

of Mines a general and professional course in engineering the regents are not violating the statute declaring the purpose and scope of such school.

The plaintiffs and relators also ask this court to restrain the defendants, as the board of regents, from continuing at the College of Agriculture and Mechanic Arts, at Brookings, "general professional courses in engineering, to-wit: civil engineering, mechanical engineering, electrical engineering and chemical engineering, and the following further courses, to-wit:

"College courses in music; college courses in journalism; commercial science courses, including general courses in economics, commerce, and business administration and advertising, sales management, transportation, public finance, corporate finance, investments, business forecasting, credit and collections, and retailing; courses in pharmacy; general science courses which include history, political science, journalism, sociology, chemistry, mathematics, physics, art, English, music, foreign languages, psychology, insurance, money and banking, education, courses in education and psychology, including general methods of teaching, observation and practice teaching, principles of secondary education, educational psychology, methods of teaching in high school, history of education, principles of supervision, special methods in social studies; educational administration, educational measurements, educational statistics, curriculum construction, supervised observation and practice teaching, education seminar, elementary psychology, intelligence tests, genetic psychology, social psychology, courses in graduate study not confined to agriculture or the natural sciences connected with agriculture or those sciences bearing directly upon the industrial arts and pursuits."

By action taken by the defendants at their April, 1933, meeting, music and the commerce department at the State College were eliminated from the current curriculum in any form other than minor service courses, so with these courses we are not now concerned.

The College of Agriculture and Mechanic Arts first came into being by virtue of chapter 3 of the Territorial Session Laws of 1881, providing for the establishment of an agricultural college at Brookings, Dakota territory. By chapter 2 of the Session Laws of 1883, the purpose of the college was declared as follows: "The

purpose of said college shall be the instruction of persons, both male and female, in such branches as may be prescribed by the board of regents hereinafter provided for." Section 1.

In 1887, the territorial Legislature passed a further purpose statute (chapter 6, Laws 1887) containing substantially the same language as that contained in the present purpose statute constituting the charter under which said college is now operating. Thus it will be seen that the State College has functioned under substantially the same purpose statute for upwards of forty years.

The statute now in force declaring the purpose of the State College of Agriculture and Mechanic Arts is section 5597, Rev. Code 1919, and is as follows: "The purpose of this institution is to afford practical instruction in agriculture and the natural sciences connected therewith, and also the sciences which bear directly upon all industrial arts and pursuits. The course of instruction shall embrace the English language and literature, mathematics, civil engineering, agricultural chemistry, animal and vegetable anatomy and physiology, the veterinary art, entomology, geology and such other natural sciences as may be prescribed; political, rural and household economy, horticulture, moral philosophy, history, bookkeeping and especially the application of science and the mechanic arts to practical agriculture."

The purpose statute above set forth is broad and elastic in its scope and provisions; it confers much power upon the regents, and gives them a wide discretion in formulating the curriculum to be followed at the State College. As in the case of the School of Mines, the construction placed upon this purpose statute by the people of this state and of the territory that preceded it, and acted upon by their governmental agencies for upwards of forty years, must be considered in construing this statute.

■ The State College of Agriculture and Mechanic Arts is what is known as a "Federal Land Grant College." The record shows that during the past year nearly $300,000 was received from the United States in aid of this college. These annuities were paid in pursuance of what is known as the "Morrill Act," originally passed by the United States Congress in 1862 (12 Stat. 503 [7 USCA § 301 et seq.]), and subsequently amended to enlarge its scope. By the terms of this legislation certain public lands were set apart to endow and aid at least one college in each state. Other

supplemental acts have been passed by the United States Congress to carry out the policy declared and established by the "Morrill Act." Space will not permit a review of all of these acts, although a review of the same is both interesting and illuminating. In order to obtain the benefits of the "Morrill Act" and subsequent federal aid legislation, it was necessary for this state through its Legislature, by appropriate legislation, to accept such grants; and in so doing the state bound itself legally and morally to carry out the purposes for which the grants and annuities were extended.

The purpose of the "Morrill Act" is indicated by section 4 (as amended April 13, 1926, 44 Stat. 247 [7 USCA § 304]), which after providing for a perpetual trust fund, states: " * * * And the interest of which shall be inviolably appropriated, by each State which may take and claim the benefit of sections 301 to 308, inclusive, of this chapter, to the endowment, support, and maintenance of at least one college where the leading object shall be without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislatures of the States may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life."

Numerous public and semipublic documents as well as theses by eminent educators have been submitted in this case bearing upon the purpose of federal land grant colleges. To review the same would unduly extend this opinion. We believe the general purpose is aptly and laconically stated in the foregoing statute in the clause: "To promote the liberal and practical education of the industrial classes in the several pursuits and professions in life." This clause is vast and comprehensive in its meaning. Under modern conditions, almost every branch of learning involves some pursuit or profession in life.

■■ We conclude that, under the statute declaring the purpose of the State College of Agriculture and Mechanic Arts, construed in connection with the federal statutes pertaining to federal land grant colleges, and in view of modern conditions, and the mechanics of our system of higher education, the regents have not exceeded the prohibition of the statute in continuing the courses complained of at the State College. Within the purposes of the statute their discretion is "vast and subject to little, if any, control."

■ To what extent the state is justified in spending public money, gathered from general taxation, for the support of institutions of higher learning under existing economic conditions, is the problem of the people to be solved by the Legislature within constitutional limits. It is a matter that presents no judicial question. Certain it is that, so long as we maintain a system of higher education consisting of three distinct units located at widely separated points in the state, some duplication of study courses is inevitable if our young people are to receive liberal and practical education in the "several pursuits and professions in life." Unless our institutions of higher learning are made to serve a practical purpose, we may expect our young people to seek their education at the institutions of other states where a complete course may be obtained upon one campus within a specific term of years.

The application for a restraining writ will be denied.

No costs will be taxed.

All the Judges concur.

BABCOCK and BECK, Circuit Judges, sitting for RUDOLPH, P. J., and ROBERTS, J., disqualified.