BOE, Plaintiff v. FOSS et al., Defendants

(77 N.W.2d 1)

(File No. 9577. Opinion filed May 4, 1956)

M. Q. Sharpe, John W. Larson, Kennebec, for Plaintiff.

George J. Danforth, Jr., Sioux Falls, Phil Saunders, Atty Gen., Walter Mueller, Asst. Atty. Gen., for Defendants.

SMITH, J. The plaintiff taxpayer has invoked our original jurisdiction to arrest the proceedings of His Excellency, the Governor of this state, and of its Finance Commissioner and Board of Regents of Education in connection with the financing of the construction of three dormitory buildings on the campus of the State College of Agriculture and Mechanical Arts at Brookings, South Dakota, on the grounds that such proceedings are in excess of the jurisdiction and powers of the named officers and board.

It is provided by Ch. 49, Laws 1955, that when it deems dormitory and apartment housing necessary and feasible at any educational institution under its control, the Board of Regents, with the consent and approval of the Governor and the Secretary of Finance, may construct, furnish and equip such buildings, and finance such construction, furnishings and equipment by issuing revenue bonds to the payment of which it is authorized to pledge not only the "income" of the buildings so constructed at a particular institution, but also, for a period of not to exceed ten years the "net income" of dormitory and apartment housing then existing at such institution. The act provides that the title to such buildings shall be and remain in the state, and that "No indebtedness,

bond or obligation incurred or created under authority of this act shall be or become a lien, charge or liability against the state of South Dakota nor against the Board of Regents, nor against the property or funds of the state, except to the extent of the income hereinabove authorized to be pledged."

At a meeting held December 2, 1955, the Board of Regents adopted a resolution to construct a women's dormitory, a men's dormitory, and an apartment building on the campus of the South Dakota State College of Agriculture and Mechanical Arts, estimated to cost respectively $750,000, $750,000 and $400,000, and to provide funds for such construction to issue revenue bonds in the aggregate of those amounts pursuant to the provisions of the above cited Ch. 49, Laws 1955. The resolution provided: "That the bonds to be issued under the provisions of the foregoing Resolution shall be payable solely from and secured by an irrepealable first and prior pledge of the net revenue of the respective new buildings herein authorized, until such bonds are paid in full and that in addition thereto by a pledge of the net revenues of all or such of the existing dormitory facilities at said institution, not otherwise pledged, for a period of ten years as may be required by the purchasers of said bonds, and in an amount of not less than $500,000 payable in amounts of not less than $50,000 per annum for 10 consecutive years, and the Board of Regents does hereby covenant that so long as any of the bonds herein authorized to be issued remain outstanding and unpaid, that it will not issue any additional obligations payable from the revenues of the buildings hereby pledged. That all gross revenues, including revenues from dining halls and food facilities, shall be kept in and credited to separate accounts from which there shall be paid all expenses of operation, repair and maintenance, including utilities and heating, and a sufficient amount retained to pay estimated costs of current operations during ensuing month, and balance deemed net revenues and shall be transferred to Bond Revenue Redemption Fund. Out of said fund shall be paid all principal of and interest on bonds issued hereunder and the balance therein shall create a reserve equal to principal and interest falling due on said bonds during the next succeeding twelve months. Any

balance in said fund shall be used to redeem bonds on the next redemption date in the manner as may hereinafter be provided." The resolution also states: "The bonds to be issued under the terms of this Resolution shall contain the following provision: 'No indebtedness, bond or obligation incurred or created under the authority of this act shall be or become a lien, charge or liability against the state of South Dakota nor against the Board of Regents, nor against the property or funds of the state, except to the extent of the income hereinabove authorized to be pledged.'" Other details of the resolution are without relevance to the issues we are to consider. The resolution of the Board of Regents was subsequently approved by the Governor and the Secretary of Finance.

At bar it was stated that plans are afoot for several million dollars of construction at the institutions controlled by the Board of Regents pursuant to the provisions of Ch. 49, Laws 1955.

The principal ground put forward by the plaintiff taxpayer for arresting the described proceedings is that the resolution provides for the issuance of revenue bonds, which, when executed, issued and sold will be and constitute a debt of the State of South Dakota exceeding the sum of $100,000 contrary to Sec. 1, Art. XIII of the constitution of South Dakota, and also exceeding one-half of one percent of the assessed valuation of the property of the state other than rural credits, contrary to Sec. 2, Art. XIII of the constitution of South Dakota.

Sec. 2, Art. XIII of our constitution reads as follows: "For the purpose of defraying extraordinary expenses and making public improvements, or to meet casual deficits or failure in revenue, the state may contract debts never to exceed with previous debts in the aggregate one hundred thousand dollars, and no greater indebtedness shall be incurred except for the purpose of repelling invasion, suppressing insurrection, or defending the state or the United States in war and provision shall be made by law for the payment of the interest annually, and the principal when due, by tax levied for the purpose or from other sources of revenue; which law providing for the payment of such inter-

est and principal by such tax or otherwise shall be irrepealable until such debt is paid: Provided, however, the state of South Dakota shall have the power to refund the territorial debt assumed by the state of South Dakota, by bonds of the state of South Dakota."

The provisions of Sec. 1, Art. XIII to which the taxpayer plaintiff makes reference reads as follows: "For the purpose of developing the resources and improving the economic facilities of South Dakota, the state may engage in works of internal improvement, may own and conduct proper business enterprises, may loan or give its credit to, or in aid of, any association, or corporation organized for such purposes. * * * The limit of indebtedness contained in Section 2 of this article shall not apply to the provisions of this section, but the indebtedness of the state for the purposes contained in this section shall never exceed one-half of one per cent of the assessed valuation of property of the state, * * *,"

It seems manifest that Sec. 1, Art. XIII is without relevance. The provisions of that section of our constitution, to which plaintiff points, were introduced by way of amendment in November 1918 pursuant to Ch. 163, Laws 1917, for the purpose of granting powers the sovereign people had theretofore withheld from their government. Traditionally, dormitory facilities and services have been deemed an essential part of the function of maintenance of an educational institution by our states. State ex rel. Fatzer v. Board of Regents of State of Kansas, 167 Kan. 587, 207 P.2d 373, and cf. State College Development Ass'n v. Nissen, 66 S.D. 287, 281 N.W. 907. Long before this amendment of 1918 our state had provided these facilities and services at its educational institutions. Therefore, we conclude that in the sense those terms are employed in this section of the constitution, the state neither engages in "works of internal improvement" nor does it conduct a "business enterprise" when it constructs and operates these facilities at its educational institutions. In so functioning it is engaged in a work of education.

Of interest in this connection is the abridgment of the opinion of the late Mr. Justice Mitchell appearing in the syllabus of Rippe v. Becker, 56 Minn. 100, 57 N.W. 331,

22 L.R.A. 857, and quoted with approval in State ex rel. Thomson v. Giessel, 267 Wis. 331, 65 N.W.2d 529, at page 535, as follows: " ' " 'Works of internal improvement,' as used in the constitution, means, not merely the construction or improvement of channels of trade and commerce, but any kind of public works, except those used by and for the state in performance of its governmental functions, such as a State Capitol, State University, Penitentiaries, Reformatories, Asylums, Quarantine Buildings, and the like, for the purpose of education, the prevention of crime, charity, the preservation of public health, furnishing accommodations for the transaction of public business by state officers, and other recognized functions of state government." ' "

The response of the defendants to the contention of the plaintiff that the proposed issue of revenue bonds is proscribed by the organic debt limitation, first quoted supra, is that because the state is not bound to pay the bonds in any event, and they are payable solely out of a special fund which is not directly fed by tax revenues, they do not constitute such a debt as is contemplated by this constitutional provision.

In State College Development Ass'n v. Nissen, 66 S.D. 287, 281 N.W. 907, this court held that the pledge of the net revenue of two dormitories to be located on the campus of this same college in payment of revenue bonds to be issued by the State College Development Assn. would not give rise to a debt within the meaning of Sec. 2, Art. XIII of the constitution. In that case the building was to be erected by the Association, but was to be owned and operated by the state. This court looked to the substance of the transactions and saw that it was a method of financing whereby "The buildings will be made available to the state under a proposed contract enabling the state to pay for their construction and equipment from earnings."

Our decision in that case was predicated on the special fund doctrine as formulated by the California court in the case of Garrett v. Swanton, 216 Cal. 220, 13 P.2d 725, at page 729, in words as follows: " 'The overwhelming weight of judicial opinion in this country is to the effect that bonds, or other forms of obligation issued by states, cities, counties,

political subdivisions, or public agencies by legislative sanction and authority, if such particular bonds or obligations are secured by and payable only from the revenues to be realized from a particular utility or property, acquired with the proceeds of the bonds or obligations, do not constitute debts of the particular state, political subdivision, or public agency issuing them, within the definition of "debts" as used in the constitutional provisions of the states having limitations as to the incurring of indebtedness.' "

Our decision in State College Development Ass'n v. Nissen was adhered to in Mettet v. City of Yankton, 71 S.D. 435, 25 N.W.2d 460, wherein we held that revenue bonds to be issued by the City of Yankton in purchase of a Missouri River bridge payable solely from a special fund arising from toll charges for its use do not constitute a debt within the meaning of Sec. 4, Art. XIII of the constitution, which section limits the debt to be incurred by such a city.

It is now faintly suggested that those decisions are unsound and should be overruled. Those holdings and that of Gross v. City of Bowdle, 44 S.D. 132, 182 N.W. 629, are so universally accepted we are content to say that they are no longer open to debate.

More is involved in the case at bar. By their proceedings the Board of Regents has pledged to a special fund and to the payment of these revenue bonds, not only the net income of the facilities to be acquired with their proceeds, but also the net income, in an amount of not less than $500,000 of the dormitories presently in use at the college. Conceding that the holders of the proposed bonds must look solely to the special fund thus created for payment of principal and interest, the question arises whether, within the meaning of Sec. 2, Art. XIII, a debt is incurred because the Board of Regents, an agency of the state, with the sanction of the legislature, is pledging in payment of these bonds resources and revenues belonging to the state in addition to the net income of the property to be acquired with their proceeds. Because of that pledge of additional property and resources of the state, we are solemnly persuaded that such a debt will be incurred.

It would, we think, be idle to consider whether such an obligation to repay not less than $500,000 out of a presently owned income or property of the state constitutes a debt of the state as that term is employed in popular or common usage. Obviously it constitutes a debt in that sense. The crucial inquiry is whether those who framed and adopted our constitution used the term "debt" in some special or limited sense, which fails to comprehend such a debt.

In Christopherson v. Reeves, 44 S.D. 634, 184 N.W. 1015, 1017, it was written, "It is elementary that in construing a constitutional or statutory provision the words must be taken, and are presumed to have been used, in their usual and ordinary sense, unless there is a constitutional or statutory definition of the word, which, of course, would control, or unless the context is so plainly repugnant to the usual and ordinarily accepted meaning of the word as, of very necessity, to impose another meaning upon it." And see Schomer v. Scott, 65 S.D. 353, 274 N.W. 556, and State ex rel. Mills v. Wilder, 73 S.D. 330, 42 N.W.2d 891.

■ Elsewhere it has been aptly written: "It is a general rule that the words of a constitution are to be understood in the sense in which they are popularly employed, unless the context or the very nature of the subject indicates otherwise. Every word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it. Constitutions are not designed for metaphysical or logical subtilties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary gloss. * * *" Black on Interpretation of Laws, page 33.

In Cooley on Constitutional Limitations, 7th Ed., p. 89, it is written, "The object of construction, as applied to a

written constitution, is to give effect to the intent of the people in adopting it. * * * In interpreting clauses we must presume that words have been employed in their natural and ordinary meaning. As Marshall, C.J., says: 'The framers of the constitution, and the people who adopted it, "must be understood to have employed words in their natural sense, and to have intended what they have said." ' This is but saying that no forced or unnatural construction is to be put upon their language; and it seems so obvious a truism that one expects to see it universally accepted without question; but the attempt is made so often by interested subtlety and ingenious refinement to induce the courts to force from these instruments a meaning which their framers never held, that it frequently becomes necessary to redeclare this fundamental maxim. Narrow and technical reasoning is misplaced when it is brought to bear upon an instrument framed by the people themselves, for themselves, and designed as a chart upon which every man, learned and unlearned, may be able to trace the leading principles of government."

In re Rural Credits Law, 38 S.D. 635, 162 N.W. 536, 540, contains an opinion of three of the judges of this court in these words: "What was the object intended to be accomplished by those laws which provide for the levying of taxes to speedily pay a 'debt' when contracted and provide for the limitation of the total indebtedness of a state or of a political division thereof? These provisions were adopted in order to counteract the tendency of the living to obtain conveniences at the expense of unborn generations; in other words, to prevent the casting upon the shoulders of to-morrow the burdens that should be borne by to-day. But only those laws should be held to be under the ban which have the purpose and effect of accomplishing that which these provisions are intended to prevent. No law can properly come under such ban which does not intend the actual incurring of a liability and the future levying of taxes to meet the same. If the law contemplates that the liabilities shall be met and cared for in a manner other than by general taxation, the mere possibility that a contingency may arise under which such liability or a part thereof shall need to be met through a

general tax, at least unless it is apparent that such possibility is in fact a probability, is not enough to invalidate the law." That view finds some support in the authorities. Cf. State ex rel. Capitol Addition Bldg. Comm. v. Connelly, 39 N.M. 312, 46 P.2d 1097, 100 A.L.R. 878. But it did not prevail when the issue was presented for decision in Schaaf v. South Dakota Rural Credits Board, 39 S.D. 377, 164 N.W. 964.

■ Looking to its context, subject matter and purpose, and to its relation to the "pay as you go" policies so obviously revealed by the constitution as a whole, we discern no rational basis for a conclusion that this debt-limiting provision thereof relates only to debts for the payment of which taxes must be levied. The very words of the particular section seem to foreclose such a construction; it directs that provision for the repayment of the indebtedness of which it speaks must be made by tax levied for the purpose or from **"other sources of revenue"**. Hence, it seems reasonable to think that those who framed and adopted this provision intended to limit debts payable from income other than from the levy of a tax.

■ Various purposes have been suggested as the motivating purpose of this constitutional provision, such as shielding the taxpayer from the burdens of debt service, the fostering of public credit, and the restraining one generation from enjoying benefits at the expense of those to come. We do not question these purposes. Our doubt arises however when it is asserted that the method adopted to accomplish those ends was to limit only the creation of debt for the repayment of which a tax is to be levied, or as others put it, a debt to the payment of which the full faith and credit of the state is to be pledged.

Consider this provision as a means proposed for protecting the taxpayer. Practical minds would not fail to know that the ultimate incidence of any debt which consumes a public income or resource will be on the taxpayer, and that he cannot be insulated from that impact by the ingenious device of the so-called special fund. Think of the debt here in question. The income of the present dormitories pledged to its payment has been appropriated heretofore for use by the college. In addition large appropria-

tions are constantly required to finance its program of education. When the described dormitory income is withdrawn from the college it must be replaced by tax revenue. By such examples it can be made manifest that nothing short of a limitation applicable to debts of every kind can afford a taxpayer adequate protection. What reason can be advanced for concluding that the practical men of common sense who framed and adopted this compact intended less than the most effective protection they could provide for the taxpayer. A like analysis applied to each purpose which motivated this limitation leads us to the same conclusion, viz., that those who framed and adopted this measure used the term "debt" in the sense in which it is commonly understood for the purpose of saying what they meant. They were writing a constitution; if they intended only to limit debts of a kind, we have every reason for believing they would have made that intention explicit.

■ If as some sincerely believe these organic debt limitations are unrealistic and hampering progress, the appeal must be to the sovereign people. To amend the constitution is not a function of the courts.

A leading decision dealing with this problem is that of our sister state in Wilder v. Murphy, 56 N.D. 436, 218 N.W. 156, 159. With legislative sanction the board of administration sought to employ the special fund theory in financing dormitories on the campus of the University. The pledge there considered was of the income of presently owned dormitories as well as that of the proposed facilities. In addition there was a mortgage of the site of the proposed facilities. While the organic provisions of North Dakota are not identical with ours, the fundamental problem which confronted the court does not differ from the one at bar. The court had this to say: "The plaintiff contends that chapter 257, supra, in effect authorizes the state board of administration to incur a state indebtedness contrary to the provisions of this section of the Constitution. He argues that, though chapter 257 specified that 'the state shall incur no liability by reason of the exercise of the authority hereby granted to the board of administration,' nevertheless the authority given by the statute to the board of administration to enter into the

contracts and convey and pledge the property of the state (that is, sites for the buildings and the income from the dormitories) in effect is authority to create a debt within the meaning of that term as used in section 182. It seems to us that there is substance to this contention. * * * Though the statute provides that the state shall incur no liability by reason of anything that may be done by the board under the authority thus conferred, and though no bonds of the state are issued, nevertheless the fact remains that the property of the state is mortgaged and pledged, and **to that extent there is an obligation to pay on the part of the state.** Thus it seems to us there is created a debt within the meaning of that term as used in the constitutional prohibition."

The court turned to its earlier decision in State ex rel. Board of University & School Lands v. McMillan, 12 N.D. 280, 96 N.W. 310, 321, and quoted therefrom the classic words of Mr. Justice Ruggles in Newell v. People ex rel. Phelps, 7 N.Y. 9, as follows: " 'It makes no difference whether the debt is contracted on the general credit of the state or on the credit of a fund belonging to the state. When the interest on a loan is raised by a tax it comes from the pockets of the people individually, when it is paid out of a fund belonging to the people, it is paid out of their common purse. In respect to the profit and loss of the transaction, the objection is as great to the one mode of borrowing as to the other. The chief object of the restraint imposed by the twelfth section of article 7 of the Constitution (the debt-limit section) upon the contracting of public debt was to protect the people against the exhausting burden of paying interest.' " It quoted also the persuasive words of Mr. Justice Johnson in the same case as follows: " 'If language has any meaning, the legal effect of the act, if valid, is at least to devote so much of the surplus revenues of the canals as shall actually be received after 1854 to the creation of a fund to pay the canal revenue certificates and the interest thereon. If this can be done in regard to one source of revenue, we see no reason why the same thing may not be done in regard to every source of revenue of the state, including not only all revenue which may arise from property, but also all which may be realized by the exercise of the

power of taxation. Such an anticipation of revenue would no more create a debt than this bill does. It may be objected that there is a distinction between a pledge of the revenues of property owned by the state and of the revenues to be derived from taxation; but the distinction does not affect the question. Whatever consumes the revenues of the property of the state tends to render a resort to taxation necessary just to the extent to which the revenues from property have been consumed. * * * If the constitutional provision against incurring debts permits such a scheme as this to be effectual, it is of small moment to inquire what it prohibits, for it provides no practical restraint whatever upon the power of the Legislature. To attribute such an intention to the convention or to the people as to permit the one and prohibit the other is to attribute to them an entire incapacity to comprehend the subject on which they were acting, and the effect of their own language. * * *' " It is our understanding that the North Dakota court has not receded from these views. In Marks v. City of Mandan, 70 N. D. 474, 296 N.W. 39, 47, after reviewing the course of its decisions it wrote: "From the foregoing cases it may be said that North Dakota has adopted what is generally termed as the 'special fund' doctrine * * *. It is that, bonds, warrants, contracts, or other obligations issued or entered into by the state, or its municipalities, when specially authorized by statute, do not come within the meaning of the words 'debt' or 'indebtedness' as used by the debt limitations provisions of the constitution if these obligations are secured by and payable **exclusively** from revenues to be realized from public property acquired with the proceeds of the obligations or assessments on private property benefited by the special improvements."

Boswell v. State, 181 Okl. 435, 74 P.2d 940, 941, is a case involving the validity of proceedings in which an excise tax was pledged to a special fund and in payment of "Highway Revenue Anticipation Notes". The contention in support of the proceedings was that the constitutional debt limitations of that state apply only to a debt when a direct property tax is levied for its payment and the full faith and credit of the state is pledged. In a well considered opinion

the court reviewed the leading authorities dealing with special fund doctrine. In the course of its opinion it quoted from the authorities we have approved supra and a passage from the Montana court in State ex rel. Diederichs v. State Highway Commission, 89 Mont. 205, 296 P. 1033, 1035, as follows: "The fact that a special fund is created by the imposition of the license or excise tax on motor fuels with which to pay the debentures is of no importance.

"Under this contention the Legislature, or the debt-contracting authority, could divide the public revenue into numerous subdivisions, calling one the 'road fund,' another the 'school fund,' another the 'agricultural fund,' another the 'public health fund,' and others almost without limit. Debts could then be contracted in unlimited amounts and payable in the far distant future, and still be immune from attack as violating constitutional provisions limiting indebtedness provided each debt was made payable out of some one of the specially designated funds into which all of the revenue collected by taxation from the people had been divided. A mere statement of the proposition carries with it, it seems to us, its own refutation. * * *'"

In stating its conclusion the Oklahoma court said, "* * * The question, however, is not 'will the Legislature abuse the power and create all such special funds,' but 'did the people intend to give the power which might be so abused'? It is difficult to reach the conclusion that the people so intended, if they were attempting to guard against the abuses of the past. * * * What we have said clearly demonstrates that the interpretation and construction sought to be placed upon these constitutional provisions by the defendants could not have been contemplated by the framers of that document, but that the people intended that the government should be operated on a cash, or pay-as-you-go, plan. * * * We cannot approve the contention of defendants that the limitations contained in said constitutional provisions relate only to ad valorem taxes on property and have no application to specific taxes."

The special fund doctrine came before the Oklahoma court again in Application of Oklahoma Educational Tele-

vision Authority, Okl., 272 P.2d 1027, 1034. The issues arose under an amendment to their constitution and for that reason the case is distinguishable from the case at bar. However the court in its opinion made a statement which we deem to be apposite. It said, "When a dollar comes into the possession and ownership of the State, it is of no more or less value to the State and the citizens thereof because it came from cigarette tax or gasoline tax or from rent on land owned by the State, or from the sale of land owned by the State, or from oil royalties channeled into the Public Building Fund by the Legislature. There is no reason why the people in adopting the amended Section 23 should have desired to give more or less protection from future debt to either dollar, or to either fund which presently and permanently existed and belonged to the State. * * *"

Our convictions have been strengthened by the reasoning in City of Joliet v. Alexander, 194 Ill. 457, 62 N.E. 861 and State ex rel. Thomson v. Giessel, 267 Wis. 331, 65 N.W.2d 529.

The aspect of the special fund doctrine under consideration has given rise not only to a division among the courts, but among the judges, and the members of the bar. The cases are collected in 72 A.L.R. 695, at page 697; 96 A.L.R. 1393, at page 1397; 146 A.L.R. 344, at page 352; and in 100 A.L.R. 900. We do not attempt to review the authorities which read a different meaning from organic acts not to be distinguished from our own. After the most careful consideration of their reasoning, with all due respect, we are compelled to state that we do not find them persuasive. We note a statement in Chermak: The Law of Revenue Bonds, p. 91, with which we concur. It is there written, "The logic of the Special Fund Doctrine is not too impelling when closely analyzed."

From our conclusion that the proposed obligation to pay $500,000 out of income of the existing State College dormitories will create a debt proscribed by Sec. 2, Art. XIII of the constitution, it follows the proposed proceedings of the Board of Regents do transcend its power, and hence must be arrested. Anticipating the possibility of such a conclusion, request was made at bar that we nevertheless consider

the remaining issues to the end that our additional views may serve as a guide in a revision of those proceedings. We comply with that request.

Because of the conclusions we have expressed we assume that any such revision of the proceedings of the Board will involve no more than a pledge of income after deducting maintenance cost of the facilities to be acquired with the proceeds of the revenue bonds it proposes to issue. Therefore our further consideration of Ch. 49, Laws 1955, will treat that act, and plaintiff's contentions as dealing with no more than such a pledge of revenues.

■ Predicated upon Sec. 21, Art. III of the constitution, reading, "No law shall embrace more than one subject, which shall be expressed in its title", the contention is made that the appropriation, contained in the act, of revenues of the proposed facilities is ineffective because the title of the act fails to indicate that the act contains an appropriation. Plaintiff states, "The only reference made to financing the authorized projects in the title to said act is as follows: '* * * and providing for the issuance of revenue bonds therefor by pledging certain revenues and income in payment thereof'." The argument is that this language is insufficient to foreshadow the assailed provision making an appropriation. We do not share that view.

The controlling principle is stated in 42 Am. Jur., Public Funds, § 47, p. 749, as follows: "As a general rule an appropriation a necessity for which is suggested by the title of an act, if it has congruity and proper connection with the subject or object stated therein, need not be specifically expressed in the title; * * *." Annotation, L.R.A. 1917B, 812; 82 C.J.S., Statutes, § 218, p. 362; People ex rel. Moloney v. Kirk, 162 Ill. 138, 45 N.E. 830, 53 Am.St.Rep. 277; and Callvert v. Winsor, 26 Wash. 368, 67 P. 91. Cf. Milne v. McKinnon, 32 S.D. 627, 144 N.W. 117; and Davenport v. Elrod, 20 S.D. 567, 107 N.W. 833.

The elements of congruity and connection with the subject are not drawn in question. Our concern is whether the quoted language of the title is sufficient to indicate an appropriation is necessary to the accomplishment of the purpose of the act.

One of two possible positions must be valid. Either an appropriation as contained in the act was necessary before the Board could issue bonds pledging revenue as therein provided and as reflected in its title, or such an appropriation was not necessary to the validity of the proposed bonds, and therefore is without significance in considering the validity of the proceedings of the Board.

If the appropriation contained in the act was rendered necessary to the validity of the revenue bonds described in its title by Sec. 9, Art. XI of our constitution which provides: "No indebtedness shall be incurred * * * by the state, * * * except in pursuance of an appropriation for the specific purpose first made", express mention of the appropriation in the title of the act was not essential. Even under this construction of the constitution the language of the title is sufficient to indicate an appropriation is necessary to the accomplishment of the purposes of the act.

However, if the view were to be taken that these revenue bonds, because payable out of a special fund, do not constitute a debt within the quoted language of Sec. 9, Art. XI, supra, and therefore an appropriation need not be made before such a debt can be incurred, it must follow, we think, that such an appropriation is not necessary to the validity of the proceedings of the Board, and hence that the validity of the provision for such an appropriation in the act is without significance. We perceive no merit in the contention that the appropriation is ineffective.

■ It is contended that Ch. 49, Laws 1955, constitutes an unconstitutional attempt to delegate legislative power to the Board of Regents, the Governor and the Finance Commissioner. The argument is that without setting up a standard to guide and control its action, the statute purports to clothe the Board with unlimited discretion to erect buildings and to issue revenue bonds to finance the same.

Implicit in this contention is the assumption that the Board derives none of the described powers from the provisions of Sec. 3, Art. XIV of the constitution which declares that these educational institutions "shall be under the control of a board of five members appointed by the governor

and confirmed by the senate under such rules and restrictions as the legislature shall provide."

Subject to the power of the Legislature to impose restrictions or make rules to guide its exercise, the sovereign people intended the Board should be clothed with power to control or manage these institutions. The reach of that power has not been determined. Cf. State College Development Ass'n v. Nissen, 66 S.D. 287, 281 N.W. 907; State ex rel. Bryant v. Dolan, 61 S.D. 530, 249 N.W. 923; State ex rel. Prchal v. Dailey, 57 S.D. 554, 234 N.W. 45; and Johnson v. Jones, 52 S.D. 64, 216 N.W. 584. Of interest also are State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 220 N.W. 951 and Fanning v. University of Minnesota, 183 Minn. 222, 236 N.W. 217. We think we need not pause to measure that power. The views we entertain suggest we should proceed with a consideration of the contention of plaintiff under the assumption, for the purposes of this case, that the Board has received some of the power it proposes to exercise as a delegate of the Legislature.

Inherent in the division of our state government into three distinct departments by Art. II of our constitution is the principle that the Legislature cannot abdicate its essential power to enact basic policies into law, or delegate such power to any other department or body. Equally as fundamental and settled is the principle that having written broad policy into law the Legislature, in the execution of that policy, can delegate quasi-legislative power or functions to executive or administrative officers or agencies, provided it adopts understandable standards to guide its delegate in the exercise of such powers. Territory ex rel. Smith v. Scott, 3 Dak. 357, 20 N.W. 401; Davenport v. Elrod, 20 S.D. 567, 107 N.W. 833; Brookings County v. Murphy, 23 S.D. 311, 121 N.W. 793; St. Charles State Bank v. Wingfield, 36 S.D. 493, 155 N.W. 776; Application of Dakota Transportation, Inc., 67 S.D. 221, 291 N.W. 589; Utah Idaho Sugar Co. v. Temmey, 68 S.D. 623, 5 N.W.2d 486; and see Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 474; 27 Yale L.J. 892; 24 Corn. L.Q. 13.

The difficulty for law-making bodies and courts alike has arisen in the application of these fundamental principles.

At an early date Chief Justice Marshall, in Wayman v. Southhard, 10 Wheat. 1, 23 U.S. 1, 6 L. Ed. 253, wrote: "It will not be contended that Congress can delegate to the courts, or to any other tribunal, powers which are strictly and exclusively legislative. But Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself. * * * The line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions, to fill up the details." Seemingly that line remains indistinct.

The author of the annotation in 79 L.Ed. 474 states, "It must be recognized at the outset that there is no absolute and universal formula for determining in all cases the powers which must be exercised by the legislative body itself and those which may be delegated by the legislature to some subordinate or administrative agency."

Chief Justice Taft indicated that decision in a particular case should rest more on practical than on rigid technical grounds. In Hampton, Jr., & Co. v. United States, 276 U.S. 394, at page 406, 48 S.Ct. 348, at page 351, 72 L.Ed. 624, he wrote, "This is not to say that the three branches are not co-ordinate parts of one government and that each in the field of its duties may not invoke the action of the two other branches in so far as the action invoked shall not be an assumption of the constitutional field of action of another branch. In determining what it may do in seeking assistance from another branch, the extent and character of that assistance must be fixed according to common sense and the inherent necessities of the governmental co-ordination."

Chief Justice Stone wrote in Yakus v. United States, 321 U.S. 414, at page 425, 64 S.Ct 660, at page 668, 88 L.Ed. 834, as follows: "As we have said: 'The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality * * * to perform its function.' * * * Hence it is irrelevant that Congress might itself have prescribed the maximum price or have provided a more rigid standard by which they are to be

fixed; * * * Congress is not confined to that method of executing its policy which involves the least possible delegation of discretion to administrative officers. * * * It is free to avoid the rigidity of such a system, which might well result in serious hardship, and to choose instead the flexibility attainable by the use of less restrictive standards. * * * Only if we could say that there is an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress had been obeyed, would we be justified in overriding its choice of means for effecting its declared purpose of preventing inflation."

Based upon a cogent analysis of the authorities Prof. John B. Cheadle submits that "Congress may not delegate the choosing of policies nor the duty of formally enacting the policy into law, but it may formulate that policy as broadly and with as much or as little detail as it sees proper and it may delegate the duty of working out the details and the application of the policy to the situation it was intended to meet. The rule, therefore,—so far as there may be said to be a rule against the delegation of legislative powers—is not a prohibition against delegations of legislative functions or of the duty to do acts legislative in their nature after Congress has laid down the broad rule; but it is a prohibition of the attempted subdelegation of the very power itself or the duty of meeting in annual session and declaring the national will in some form of enactment in the general laws. As to when the necessity for delegation exists, the decision rests with the legislative body—a discretion not to be disturbed by the courts except in clear cases of abuse. The very fact of the separation of powers should make courts more careful in this respect." 27 Yale L.J. 892 at 901.

With this background we look at the challenged legislation to ascertain whether there has been an attempt to delegate the power of choosing basic policy or a failure to supply the selected delegate with intelligible standards to guide it in the exercise of the power delegated to it.

In substance the act authorizes the Board of Regents to construct the described facilities on the grounds of any of the institutions under its control "whenever such Board

shall deem such dormitories and apartment housings necessary and feasible at said institutions". To accomplish that purpose the Board is authorized to "issue revenue bonds in such amounts as may be necessary and to pledge in payment thereof the income from such dormitory or apartment housings to be built". In addition there is a provision appropriating income so pledged, and others dealing with title to the property, nonliability of the State, and severability of the act.

This act must be read in connection with some facts which are commonly known. The Board of Regents has seven state educational institutions under its control. There has been an unprecedented increase in the enrollment of students at most, if not all, of these institutions. Among the many problems generated by these swollen student bodies is one of providing such housing and living conditions as are deemed essential to a soundly conceived educational program. The questioned legislation was adopted in an effort to solve that problem. Its ultimate purpose is to clothe the Board of Regents with power to make contracts with those who will supply capital to provide needed housing on a self-liquidating basis.

The basic decisions were made by the Legislature. It determined where dormitories or apartment housing was "necessary" and "feasible" at any of these institutions it would attempt to supply those facilities through revenue financing. In the execution of this policy it called to its aid the governing board of these schools to do that which it could not conveniently do for itself.

 The first impression is that it granted a broad discretion to the Board in very general terms. Reflection however will impel the conclusion that the powers granted are operative in a very limited field. Before action can be taken the facts must reveal that a particular structure is "necessary" and "feasible." These standards are neither difficult to understand nor apply. Whether the structure is "necessary" depends on the relationship of the firm student population at the particular institution to the available acceptable housing in existing dormitories and in the community. The feasibility of that structure will depend on

whether the revenue it will produce at rates students can and should pay will be sufficient to induce investors to supply the capital to bring it into being. To qualify as "feasible" a project must produce acceptable housing and service to students as reasonable rates without unreasonable cost in debt service. We think the selected standards are such as men of common sense can understand.

In our opinion the act involves no more than a lawful delegation of power to act according to reasonable and understandable standards in the execution of a broad policy written into law by the Legislature. We hold plaintiff's contention to be untenable.

■ There is need for a final word. Following the decision in State College Development Ass'n v. Nissen, supra, the Legislature enacted SDC Supp. 15.0726 reading "That the Board of Regents of this state is hereby expressly prohibited from erecting any buildings or structures or maintaining and equipping such buildings without the approval of the Legislature first obtained." We are now told that the present proceedings of the Board should be halted because the particular buildings therein described have not been approved by the Legislature as required by that statute. We do not so construe these statutes. The quoted statute was enacted in the exercise of the constitutional power of the Legislature to restrict the powers of the Board of Regents. It seems manifest to us that Ch. 49, Laws 1955, was intended to remove from that restriction dormitory facilities constructed with the proceeds of revenue bonds, and thus to vest the Board with power to proceed forthwith to provide these institutions with needed self-liquidating housing for students.

Our order will be that the Board of Regents is restrained and enjoined from pledging the income of dormitory facilities existing at South Dakota State College of Agriculture and Mechanical Arts in payment of the revenue bonds it proposes to issue pursuant to its resolution of December 2, 1955.

All the Judges concur.